# CASE OF THE STATE FREIGHT TAX.

### [READING RAILROAD COMPANY v. PENNSYLVANIA.]

1. The transportation of freight, or of the subjects of commerce, is a constituent part of commerce itself.
2. A tax upon freight, transported from State to State, is a regulation of commerce among the States.
3. Whenever the subjects in regard to which a power to regulate commerce is asserted are in their nature National, or admit of one uniform system or plan of regulation, they are exclusively within the regulating control of Congress.
4. Transportation of passengers or merchandise through a State, or from one State to another, is of this nature.
5. Hence a statute of a State imposing a tax upon freight, taken up within the State and carried out of it, or taken up without the State and brought within it, is repugnant to that provision of the Constitution of the United States, which ordains that " Congress shall have power to regulate commerce with foreign nations and among the several States, and with the Indian tribes."

ERROR to the Supreme Court of Pennsylvania; the case being thus:

On the 25th of August, 1864, the Legislature of Pennsylvania passed an act entitled "An act to provide additional revenue for the use of the Commonwealth." It enacted—

"SECTION 1. That the president, treasurer, cashier, or other financial officer, of every railroad company, *steamboat* company, canal company, and slackwater navigation company, and *all other* companies now or hereafter doing business *within this State*, and *upon whose works* freight may be transported, whether by such company or by individuals, and whether such company shall receive compensation for transportation, for transportation and toll, or shall receive tolls only, except turnpike companies, plank-road companies, and bridge companies, shall, within thirty days after the first days of January, April, July, and October of every year, make return in writing to the auditor-general, under oath or affirmation, stating fully and particularly the number of ons of freight carried over, through, or upon the works of said ompany, for the three months immediately preceding each of

the above-mentioned days; and each of the companies, except as aforesaid, shall, at the time of making such return, pay to the State treasurer, for the use of the Commonwealth, on each two thousand pounds of freight so carried, tax at the following rates, viz. :

" First, on the product of mines, quarries, and clay-beds, in the condition in which said products may be taken therefrom, 2 cents.

" Second, on hewn timber, animal food, including live stock; also, on the products of the forest, vegetable, and other agricultural products, the value of which has not been increased by labor, 3 cents.

" Third, on all other articles, 5 cents.

"Where the same freight shall be carried over and upon *different but continuous lines, said freight shall be chargeable with tax as if it had been carried but upon one line, and the whole tax shall be paid by such one of said companies as the State treasurer may select and notify thereof.* Corporations whose lines of improvements are used by others for the transportation of freight, and whose only earnings arise from tolls charged for such use, *are authorized to add the tax hereby imposed to said tolls and collect the same therewith,* but in no case shall tax be twice charged on the same freight carried on or over the same line of improvements: *Provided,* That every company now or hereafter incorporated by this Commonwealth, whose line extends into any other State, and every corporation, company, or individual of any other State, holding and enjoying any franchises, property, or privileges whatever in this State, by virtue of the laws thereof, shall make returns of freight and pay for the freight carried over, through, and upon that portion of their lines within this State, as if the whole of their respective lines were in this State."

[It is a fact that is referred to in the argument, and which may, therefore, well enough be here noted, that the roads of some railroad companies in Pennsylvania traverse the whole of that great State. That is the case with the railroad of the Pennsylvania Railroad Company (the great " Pennsylvania Central"); also of the Philadelphia and Erie. Other roads are very short; hardly Pennsylvania roads at all. This is the case with the Lake Shore Road in what is known in Pennsylvania as " the Triangle;" the small part of the State which borders on Lake Erie. The east terminus of the road

receives converging roads from the whole State of New York, from New Jersey, and from all New England, and from its western end roads diverge again over the whole West. So the New York and Erie Railroad, whose line for its main great extent runs along the south line of New York, but which, from a necessity of the soil in New York, had to make a small curvature which brings it for a few miles into Pennsylvania. So the Philadelphia, Wilmington and Baltimore, in its chief length in Maryland and Delaware, its northern terminus only in Pennsylvania. So other roads.]

On the 25th of October, 1866, the accounting officers of Pennsylvania stated an account under the statute already quoted between the Commonwealth and the Reading Railroad Company, "for tax on tonnage for the quarters ending December 31st, 1865, and March 31st, and June 30th, 1866." The company named is a corporation created under the laws of Pennsylvania, and is engaged in the sole business of transporting freights for hire, and carrying no commodities of its own. An important part of its business is carrying coal from the mountains of Pennsylvania to a place called Port Richmond, near Philadelphia, a distance of about one hundred miles; the whole road being in Pennsylvania. A portion of the coal transported to Port Richmond is sold there to consumers, but by far the larger portion is intended for exportation to points beyond the limits of Pennsylvania, and is transferred at Port Richmond into vessels destined for such points. A considerable quantity of coal is also transported by the railroad company to a point on the Schuylkill Canal, where it is loaded in barges and exported beyond the State. The company was charged by the State:

For freight transported to points within the State of Pennsylvania,  .  .  .  .  .  .  .  .  . $38,361
For that exported to points without the State, .  .  .  46,520
                                                    ————————
                                                    $84,881

The latter sum the railroad company refused to pay. It set up that the statute of 1864, to the extent that it imposed a tax on freight other than that both received and delivered

within the State of Pennsylvania, was unconstitutional and void, because, among other reasons, it was in conflict with the Constitution of the United States, which ordains that "Congress shall have power to regulate commerce with foreign nations, and among the several States."

Suit being brought in the Common Pleas of Dauphin County, the jury found that the freight in question was originally destined for exportation beyond the boundaries of Pennsylvania, and that it was actually exported, in a continuous course of transportation, in the cars of the defendants, to points on the river Delaware, or the Schuylkill Canal, and thence in vessels. Being instructed by the court (PEARSON, J.) that such a finding should be followed by a verdict for the defendants, verdict and judgment so went.

The charge of the judge was but a reiteration of the opinion which he had previously expressed in other cases on the constitutional point in question, and which appeared to have been acquiesced in by the Commonwealth of Pennsylvania, since, although writs of error were taken to the judgments in those cases, he observed that they were never argued, "as they were considered correctly decided by the then Attorney-General of Pennsylvania, the Honorable W. M. Meredith." However, a writ of error was taken from the Supreme Court of Pennsylvania to the judgment entered on the verdict in the present cause, and it resulted in the judgment of the Court of Common Pleas being reversed by the higher tribunal;* that court admitting the force of the argument that could be made against their view, but conceiving that "a case of simple doubt should be resolved favorably to the State act, leaving the correction of the error, if there was any, to the Federal judiciary."

To understand the full force of the argument in the opinion of that court, the reader must refer to the opinion itself. Among other grounds on which it rested the reversal, were these:

That the products carried from points within the State to

---

* See 62 Pennsylvania State, 286.

points without, or from points without to points within, were not discriminated against and required to pay more than other products carried wholly within the State, all paid the same exact freight; a charge for transportation simply.

That this tax was not imposed as, or intended to be, a regulation of commerce, in other words a rule by which commerce was to be governed; but was a tax to raise money for the support of government, and made, therefore, in the exercise of an authority which flowed from the power to tax for revenue.   Adverting to the case of *Brown* v. *Maryland*,* and to the question put there by Chief Justice Marshall, as about a thing plainly unconstitutional,—

"What restrains a State from taxing any article passing through it from one State to another, for the purpose of traffic? Or from taxing the transportation of articles passing from the State itself to another State, for commercial purposes?"—

the Supreme Court of Pennsylvania said:

"The Chief Justice had reference to *specific burdens.*  These subjects must not be singled out and taxed, for this would be discrimination affecting intercourse, invidious and inviting retaliation from other States or foreign powers.   But he did not mean by these illustrations, that those who use the artificial works, constructed by the State, or under their franchise, might so do without conpensation, because they transported their goods on them for such purposes, or that they are not bound to share with our citizens the equal burdens, which is the price they must pay for availing themselves of these facilities."

That in virtue of her unquestioned power to improve her own resources and to regulate her internal affairs, the State had built up a network of railways and canals, and had improved natural channels, and that in virtue of her right of eminent domain and her power to legislate on her internal affairs and the creations of her own sovereignty, she had a right to exact tolls, charges, and fares for their use, and that whether this was done by a direct charge on the tonnage or

---

* 12 Wheaton, 419.

by a tax on the corporations who used the franchise was unimportant.

The court stated that it would not rest the case on the debatable ground of State power to regulate interstate commerce in the absence of Congressional legislation on the same subject. The case, having been brought here, was twice argued.

*Messrs. James E. Gowen and Robert E. Lamberton, for the plaintiff in error; a brief of Mr. J. W. Simonton, for other railroad companies interested with the plaintiff in error in the question involved, being filed by leave of the court.*

I. Assuming that the act in question is a regulation of interstate commerce, and therefore interferes with the constitutional authority of Congress, the first point to be considered is, whether its applicability to the domestic, as well as to the extra-territorial, commerce of the State excludes it from the operation of the constitutional provision. In other words, *is a regulation of commerce, which would be unconstitutional if confined to foreign commerce, rendered constitutional by being extended to domestic commerce also?*

If this question must be answered affirmatively, the attempt of the framers of the Constitution to secure commerce between the States from State regulation has been unsuccessful. The simple expedient of including its own domestic commerce within its commercial regulations will enable any State to regulate, to any extent, the commerce between the States which happens to be carried on within its territorial limits. The price to be paid for such a prerogative, would, in most cases, be trifling. The citizens of Pennsylvania can well afford to submit to a commercial regulation which taxes, for their benefit, the millions of tons of freight which are transported through or from their State. A regulation of commerce which taxes the vast tonnage of the great thoroughfares which traverse the State from east to west and from north to south; which taxes the tonnage of the Pennsylvania, of the Erie, of the Lake Shore, of the

Philadelphia, Wilmington, and Baltimore, and other railroads over which freight is transported, through or from the State; which compels foreign consumers of coal, and the other mineral products of Pennsylvania, to pay tribute for the privilege of having them transported, either by natural or artificial channels, by rivers or by railroads, is not likely to be considered oppressive by the people of Pennsylvania. A State through whose territory a single line of railroad passes would not hesitate to regulate railroad commerce without discriminating in favor of its own domestic commerce, if the regulations proposed would render the commerce of a continent tributary to its treasury. The steamboat traffic of the Mississippi would be a tempting subject for the commercial regulations of the several States within whose boundaries it is carried on. None of the evils which induced the framers of the Constitution to invest Congress with the power of regulating commerce between the States would be avoided under such an interpretation of the Constitution.* The increase of the States and the vast increase of commerce between them would render the burdens of State regulations a hundredfold more onerous than they were before the Constitution was adopted. Can it be supposed that, at the present time, a citizen of California would not object to paying transit duties in every State through which his merchandise may happen to be transported, on its passage from the Atlantic to the Pacific, merely because the same duties were imposed upon domestic transportation within those States. He would justly argue that the duties collected inured to the benefit of the citizens of the States which imposed them, and not to *his* benefit.

Practically, therefore, the prohibition against State regulations of interstate commerce would be nugatory, if it could be evaded by extending such regulations to domestic as well as to extra-territorial commerce; and no interpretation of the Constitution which permits such an evasion can

---

* See The Federalist, No. 7, by Mr. Hamilton, depicting the injurious consequences of permitting the several States to regulate commerce.

be legitimate. Indeed, unless it can be shown that a statute which regulates commerce between the States as well as commerce in the State, is not a regulation of commerce between the States, the argument is at an end.

In *Crandall* v. *The State of Nevada*,* a statute enacted that there should " be levied and collected a capitation tax of $1, upon every person leaving the State by any railroad, stagecoach, or other vehicle engaged and employed in the business of transporting passengers for hire." But the unanimous judgment of this court condemned the statute as unconstitutional. A majority of the court did not think the statute a regulation of commerce, though a part did. But all held the statute unconstitutional and void. The right of citizens of the United States to pass from point to point of the National territory, unrestricted by State regulations, was emphatically asserted. Would the statute have been constitutional if it had also taxed the right of passage within the State of Nevada? Can any State tax, and, by taxing, prohibit the passage of citizens of the United States, from, into, and through her territory, because she imposes a similar tax and a similar prohibition upon the right of passage within her territory? Can a State tax imported wines in the hands of the importers by a statute which taxes all wines, domestic as well as foreign?†

II. Considering the case, then, as if the tax imposed by the act in question had been expressly confined to the transportation of the freight through, into, or from Pennsylvania, *is the imposition of such a tax a regulation of commerce between the States?*

If taxing interstate commerce is not regulating it, it is not easy to imagine what would be. In *Brown* v. *Maryland*,

---

* 6 Wallace, 35; and see Clarke, Treasurer of the State of Delaware, *v.* The Philadelphia, Wilmington, and Baltimore Railroad Company, in the Court of Errors and Appeals of Delaware, A.D. 1871, and the opinion of Bates, C.; also The Erie Railway Company *v.* The State of New Jersey (2 Vroöm, 531), which, in all material respects, is identical with that now before the court.

† Low *v.* Austin, 13 Wallace, 29.

Marshall, C. J., when speaking of the power of a State to tax its own citizens or their property, within its territory, refers to the imposition of a State tax upon goods passing through or from the State, as an extreme illustration, apparently, of an encroachment upon the reserved power of Congress to regulate commerce. He says:

"If the States may tax all persons and property found in their territory, what shall restrain them from taxing goods in their transit through the State, from one part to another, for the purpose of re-exportation? The laws of trade authorize this operation, and general commerce requires it. *Or what restrains a State from taxing any article passing through it, from one State to another, for the purposes of traffic? Or from taxing the transportation of articles passing from the State itself, to another State, for commercial purposes?* These cases are all within the sovereign power of taxation, but would obviously derange the measures of Congress to regulate commerce, and affect, materially, the purposes for which the power was given."

There is nothing (as there was assumed by the court below to be) in the language quoted, which warrants the inference that "specific burdens" on the subjects mentioned were referred to. The Chief Justice was speaking of the power claimed for the States, to tax *all persons and property found on their territory;* and he meant to assert that a State tax *on all property* within its limits could not be levied on goods in transit through or from the State.

The main object of conferring upon Congress the power to regulate commerce among the several States, was to put an end to the onerous and vexatious taxes and duties with which it had been burdened by State legislation. It does not seem to have occurred to the framers of the Constitution, that the States might still continue to tax interstate commerce, notwithstanding the grant of this power to Congress; but perhaps there never has been a case yet where the validity of a State tax law has been questioned on the ground of its being a regulation of interstate commerce, in which an attempt has not been made to show that the law was not a regulation of commerce, but merely an exercise of the

State power of taxation.   The present case is no exception, but no advantage can be derived from repeating the reasons which have in former cases led this court to reject such reasoning.

Will it be said that the statute in question only incidentally and indirectly affects interstate commerce, inasmuch as the tax complained of is levied, not on the goods transported, but on the business of the transporting companies?

This distinction, even if it were substantial—which is not admitted—does not tend to show that the tax is not a regulation of commerce.   On the contrary, the fact that the *transportation* itself, and not the *goods* transported, is taxed, renders the tax the more plainly a tax upon commerce.   It is the very *commerce* itself that is taxed, and not the *subjects* with which it deals.   The imposition of a tax on every ton of coal mined in Pennsylvania would not be a tax on commerce; but a tax on the transportation of the coal from the mines to the consumer, is as clearly a tax on the commerce in coal as any that can be imagined.*

What is "commerce?"   Washington, J., in *Corfield* v. *Coryell*,† tells us:

"Commerce with foreign nations, and among the several States, can mean nothing more than intercourse with those nations and among those States, for the purposes of trade, be the object of the trade what it may, and thus intercourse must include all the means by which it can be carried on, whether by the free navigation of the waters of the several States, or by a passage overland through the States, where such passage becomes necessary to the commercial intercourse between the States."

Beasley, C. J., in *The Erie Railway Company* v. *The State of New Jersey*,‡ speaks to the same effect.   He says:

"If there can be no commerce between the States without goods, so there can be none without the transportation of goods. The two must be united to constitute interstate commerce.   So

---

* Gibbons *v.* Ogden, 9 Wheaton, 189.

† 4 Washington's Circuit Court, 379.

‡ 2 Vroom, 531.

it is not certain, then, that a duty on one of these two elements in commerce must, in the nature of things, operate as a tax upon the other. As commerce, the two things are indissoluble; are they divisible for the purpose of taxation? I think it may be laid down as a general rule, universally applicable to all cases arising under the clause of the Constitution now considered, that whenever the taxation of a commodity would amount to a regulation of commerce, so will the taxation of an inseparable incident, or a necessary concomitant of such commodity. The object being to protect the merchandise from all exactions in its transit over a State, by a rule of construction, as necessary as it is elementary, we must imply a protection to the means required to effect such a passage, because, without such implication, the privilege intended to be secured is defeated."

That the *transportation* of freight was intended by the legislature, in the act of 1864, to be the subject of the tax, is as clear as words can make it. A tax upon goods is not *per se* a tax upon commerce, much less upon interstate commerce in the goods, for they may never become subjects of commerce; but how the transportation of goods from a consignor in the State to a consignee out of the State can be taxed without taxing, and therefore without regulating interstate commerce, it is not easy to see.

In *Brown* v. *Maryland*, it was argued at the bar, that the tax was not upon the article imported, but upon the occupation of the importer. But says Marshall, C. J.:

"It is impossible to conceal from ourselves that this is varying the form without varying the substance. It is treating a prohibition, which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive that the tax on the sale of an article imported only for sale, is a tax on the article itself. It is true that the State may tax occupations generally; but this tax must be paid by those who employ the individual, or is a tax on his business. The lawyer, the physician, or the mechanic, must either charge more on the article in which he deals, or the thing itself is taxed through his person. This the State has a right to do, because no constitutional prohibition extends to it. So a tax on the occupation of an importer is in like manner a tax on importation. It must add to the price

of the article, and be paid by the consumer or by the importer himself in like manner as a direct duty on the article itself would be made (paid?).   This the State has no right to do, because it is prohibited by the Constitution."

In *Almy* v. *California*,* a tax upon a bill of lading was held to be substantially and really a tax upon the exports for which the bill of lading was to be used.

In both these cases cited, this court acted on what GRIER, J., with his ponderous sense, says in the *Passenger Cases*:†

" We have to deal with things, and we cannot change them by changing their names.   Can a State levy a duty on vessels engaged in commerce and not owned by her own citizens, by changing its name from a 'duty on tonnage' to 'a tax on the master?' or an impost on imports, by calling it a charge on the owner or supercargo, and justify the evasion of a great principle by producing a dictionary or a *dictum* to prove that a ship captain is not a vessel, nor a supercargo an impost?"

That a tax either on the transportation of goods or on goods themselves while being transported must ultimately be paid by the consumer is too clear for argument.   " When this tax is laid on the transportation of the merchandise, there is no room for doubt that, by the operation of well-known laws, it must pass from the carrier to the thing carried, and, in the precise ratio of the statutory burden, enhance their price in the market.   The consumer must pay the custom, whether it be placed on the goods or upon their transportation.   The result then is, that this imposition on the business of transportation, which, it is argued, is constitutional, produces the same effect—neither more nor less—upon the private business of the owner of the goods, as would be produced by a direct tax on the goods themselves, which latter form of taxation would be undeniably unconstitutional.   This substantial identity in the results would seem to favor strongly an inference of the substantial identity in the causes producing them.   The conclusion, from this course of reasoning, therefore is, that if the trans-

* 24 Howard, 169.                    † 7 Id. 458.

portation of merchandise *in transitu* from State to State can be taxed by a State in the form of law now before this court, the constitutional provision under consideration affords no protection whatever to the owner of goods which are the subjects of such transportation."*

The Supreme Court of Pennsylvania considers, however, that the tax may lawfully be exacted as compensation for the use of works constructed under the eminent domain of the State. But,

1. The rivers of Pennsylvania were not constructed under the State power of eminent domain, and the tax imposed by the statute on every ton of freight transported within the territorial limits of Pennsylvania, by a steamboat company, cannot be considered as a compensation for privilege of using the public works of the State. The law applies alike to all means of transportation, whether on the navigable rivers passing through the State, the great lakes of the West, or any line of canal or railroad. If goods are laden at Olean, in the State of New York, to be carried on the steamboats, or any other boats of a transportation company, to New Orleans, they may be taxed by the ton, so soon as the boat with its freight crosses the line of Pennsylvania; and thus our great rivers be no longer free to the commerce of all the citizens of every State through which it passes.

2. The State has parted with the right to exact tolls for the use of the railroads and canals owned by the canal and railroad companies of Pennsylvania. The Philadelphia and Reading Railroad Company, and not the State of Pennsylvania, has the right to charge toll for the use of its railroads.

The absence of an intention to exact a toll for the use of artificial roads or water-courses when they imposed the tax in controversy, is also made manifest by the fact that the tax is not graduated by the length of transportation. A ton of freight which passes but a few miles through the territory of Pennsylvania is taxed as much as a ton which has been transported three hundred miles. The through freight

* Per Beasley, C. J., in Erie Railway Company *v.* New Jersey, *ut supra.*

of the Philadelphia, Wilmington and Baltimore, or of the Lake Shore, or of the New York and Erie lines, all of them very short roads, is taxed as heavily as that of the Pennsylvania Railroad, which traverses the whole length of Pennsylvania.

How then can the tax on transportation, levied by the act in question, be treated as compensation for the use of artificial highways, and what advance towards a proper determination of this case is made by discussing the question of the right of a State to demand toll for the use of the railroads and canals which she owns?  Once admit that a tax on transportation within or through the territory of a State may be sustained by treating it as a toll for the use of highways, and there is no limit to the burdens which may be imposed on interstate commerce.  What proportion of the commerce by land between the States of this Union is not carried on by means of artificial roads? and where ordinary county or State roads, the control of which has been retained by the Commonwealth, are used, the theory would be much more plausible than in the case of railroads and canals constructed by companies.

Would the decision of this court in *Crandall* v. *Nevada* have been in favor of the right of a State to tax passengers in transit from her territory if it had been argued that the tax was a compensation for the use of the road on which they were travelling?

III. *The statute in question interferes with that freedom of transit of goods and persons between one State and another which must necessarily exist under a political organization like ours.*

The case of *Crandall* v. *Nevada* seems to settle this.  It is true that the tax there declared unconstitutional was a tax on the passage of persons and not of property; but the reasoning of the court is as applicable to the one case as to the other; and in *Woodruff* v. *Parham*,* the rule laid down in *Crandall* v. *Nevada* is spoken of as securing "freedom of transit of *goods* and persons between one State and another."

---

* 8 Wallace, 138.

*Mr. F. Carroll Brewster, Attorney-General of Pennsylvania, and Mr. Lewis Waln Smith, contra:*

Before considering the points of law raised by the plaintiffs in error, it is of importance to discern from the words of the act the exact practical working of the tax in its execution.

*First.* It is an act to raise additional revenue, and the mode of the collection of the tax is identical with the collection of the other taxes to which the Commonwealth looks for nearly all her revenue.

*Second.* The tax is imposed on all the corporations in the State, and is charged against each of them in proportion to all the tons carried, without any discrimination between those carried exclusively within the State, or those intended for transportation abroad.

*Third.* The company is allowed thirty days after the end of each quarter in which to report the number of tons carried, and sixty days more in which to pay the tax settled, so that the goods carried have all of them, before this tax becomes due or payable, passed beyond the jurisdiction of the State, if they were intended for shipment abroad, and no claim or lien whatever has attached to them. It is the franchise of the corporation which is liable for the non-payment of the tax.

*Fourth.* The tax, although familiarly called a "tonnage tax," is, in actual results, a tax on the corporation, graded by the amount of business it transacts in its province of transporter; and if the term "tonnage tax" implies it is a tax on a ton, it is erroneous, the 2000 pounds which go to make up a Pennsylvania ton being merely a convenient standard whereby to measure the business done by the corporation.

If such a tax be unconstitutional, it must be because it is the exercise of a power expressly and directly prohibited to the State by the Constitution of the United States. Every presumption is in favor of its legality. It is a means, and one of great importance, through which the State of Penn-

sylvania seeks to raise the funds necessary to the maintenance of the administration of the government of the State. Taxation for such a purpose is the exercise of a high and unquestioned privilege of a sovereign, and no far-drawn analogy or dubious passage can be allowed to rob her of the right which is absolutely necessary to her existence as a State—the right to raise revenue by taxation. It must ever be remembered, in considering questions arising under our complex system of government, that within its own sphere, each government, that of the United States, and that of the States, is sovereign. In exercising its power within that sphere, its acts are governed only by its own pleasure. And this view of the relation of the States to the National government is stated with great preciseness and force by this court in the recent case of *The Collector* v. *Day*,* where the Federal government sought to tax under its law, levying a general income tax, the salary of a judge of a State. Speaking of "the separate and independent condition of the States in our complex system, as recognized by the Constitution, and the existence of which," say the court, "is so indispensable, that without them the general government itself would disappear from the family of nations," this court in the case cited say:

"It would seem to follow as a reasonable, if not a necessary consequence, that the means and instrumentalities employed for carrying on the operations of their governments, for preserving their existence, and fulfilling the high and responsible duties assigned to them in the Constitution, should be left free and unimpaired; should not be liable to be crippled, much less defeated, by the taxing power of another government, which power acknowledges no limits but the will of the legislative body imposing the tax, and more especially those means and instrumentalities which are the creation of their sovereign and reserved rights. Without this power and the exercise of it, we risk nothing in saying that no one of the States under the form of government guaranteed by the Constitution could long preserve its existence."

* 11 Wallace, 113.

Is THEN THE STATUTE IN QUESTION SUCH A REGULATION OF
COMMERCE AS IS IN VIOLATION OF THE CONSTITUTION OF THE
UNITED STATES?

1. *If it is a "regulation of commerce," the State of Pennsylvania has a right, under the clause referred to, to make such regulation, Congress not having forbidden the same by legislation.*

The clause which vests in Congress the power to regulate commerce does not, *ipso facto*, take from the States the right to also regulate commerce, provided that the regulations of the latter do not come in conflict with those of the former. If there be any conflict, it is conceded that the State law at once falls. But in the present case no such question arises. Congress has not passed any law regulating commerce between the States. There can, therefore, be no conflict with a superior enactment, and the only question remaining is, whether the power regulating commerce vested in Congress is exclusive. It is submitted that there is no decision of this court which can be said to so decide. Analogies may be drawn, or the individual *dicta* of judges cited, but there is no judicial decision which settles the question. On the other hand, wherever the issue has been presented it has been avoided, and declarations from the bench abound in all the reports, disclaiming any intention of so deciding. On the other hand, the opinions of a majority of the judges, taken from their decision, bear towards the doctrine, that until Congress sees fit to exercise the power vested in it, the States have a right to regulate commerce, so far as the same are local in their nature, and do not arrive to a National rule.*

It is true that the view of the question favorable to the exclusiveness of Congressional power is sustained by the decision of this court in the cases of *Brown* v. *Maryland*, *Gibbons* v. *Ogden*,† and by the decision of a divided court in the *Passenger Cases*.‡ But the case of *Gibbons* v. *Ogden* was

---

* Sturges *v.* Crowninshield, 4 Wheaton, 122, 192; Houston *v.* Moore, 5 Id. 1; License Cases, 5 Howard, 578; Cooley *v.* Port Wardens, 12 Id. 299; Crandall *v.* Nevada, 6 Wallace, 35, and other cases.

† 9 Wheaton, 226.                              ‡ 7 Howard, 416.

decided on the ground that the State grant of an exclusive right to the waters of a navigable river was in conflict with that branch of commerce as to which Congress has made direct leglslation, and being repugnant to it must give way. Had the court been of the opinion that the grant was unconstitutional, merely because it was an attempt of a State to regulate commerce, the decision would have been based on that ground; but the court expressly avoided giving any such an opinion. So far as the *Passenger Cases* are concerned, the decision of the court was such as to greatly weaken the opinion, even had it been based exclusively on the ground of the exclusiveness of the power of Congress. However all this may be, the later cases of *Gilman* v. *Philadelphia*,* of *Hinson* v. *Lott*,† and of *Crandall* v. *Nevada*, more than balance whatever inclination the previous decisions might have had.

Indeed, *Gilman* v. *The City of Philadelphia* is emphatic in its recognition of the principle we contend for, if the meaning of the decision is rightly stated by Clifford, J., in a dissent which he made from it.  He says:

"The precise doctrine advanced, as I understand the opinion, is that Congress has not passed any act regulating the navigation of the river, and that inasmuch as there is no Federal regulation upon the subject, the law of the State legislature authorizing the erection of the bridge is a valid law, even if the bridge be an obstruction to navigation, because the State law is not in conflict with any act of Congress giving protection to the otherwise paramount right of navigation."

Is there anything in the idea that a State can regulate interstate commerce, if Congress omits to do so, which is inconsistent with the intent of the clause inserted in the Constitution giving Congress the power to regulate commerce?  We fail to see any such thing.  At the time of the adoption of the Constitution the commerce of the country was burdened by the imposition of imposts and exposts by the several States, and by the regulations of commerce im-

---

* 3 Wallace, 713.                    † 8 Id. 150.

posed by them. The power to regulate commerce was vested in Congress, so that at any time it could pass a law regulating commerce, so as to relieve it from all the burdens so vexatious under the Confederation. That power was given to Congress to exercise, should it see fit, and should the exigencies of the occasion require. If, as Johnson, J., says, in his opinion in *Gibbons* v. *Ogden,* which will doubtless be relied on in reply, " all the laws bearing on commerce dropped lifeless from the statute-book," it was not necessarily because the power of regulating commerce had ceased to be in the States, but because each State knew that if it persisted in its impositions Congress would exercise the power, and thus cancel its laws by the passage of one paramount. The moment that the direful picture, drawn by the plaintiffs in error, should be painted in experience, Congress could exercise its power and sweep all such State laws into utter nullity.

2. *The tax is not such a regulation of commerce as to be included in the power given to Congress, supposing that power to be exclusive.*

In order that we may discover whether the act now alleged to be unconstitutional is a "regulation of commerce," it is necessary to see what is "commerce," and what amounts to a " regulation." " Commerce," says Marshall, C. J., in *Gibbons* v. *Ogden,* " is undoubtedly traffic; but it is something more. It is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches, *and is regulated by prescribed rules for carrying on that intercourse.*" And again he says: "It is the power to regulate, that is, to prescribe the rules by which commerce is to be governed." This corresponds with the derivation of the word "regulate," and furnishes us with the key to what is meant by a regulation of commerce. "*Regula,* a rule—Regulate, to adjust by rule: as, to regulate weights and measures; to regulate the assize of bread; to regulate trade."* We can, therefore, paraphrase the term " power

* Webster.

to regulate commerce " by the words, " power to prescribe rules which govern the intercourse of one nation with another." Can the tax in question be considered in any way a rule to govern the intercourse of the people of Pennsylvania with those of other States? Does it make a rule to govern the shipment of a ton of coal passing out of the State? It clearly does not, for a ton of coal is shipped just as freely, without either the knowledge or interference of the State, as though there was no such law in force. It is not until months after the ton has been shipped that the State knows the fact: it is not until months later that the tax is payable by the company. How then can this be a rule to govern the intercourse? And the same reasoning applies to goods brought into the State from abroad. They are delivered to the consignees, and the packages broken and the goods sold before the railroad company is asked to pay the tax in question. There is nothing, then, which connects the tax with the goods or the intercourse. There can be no such thing as a rule where there is nothing which it affects. It is essential to a regulation that it have something to regulate. But here it neither regulates the carrier, nor the shipper, nor the purchaser, nor the goods transported. How then is it a regulation of commerce, when it does not affect any of the things that go to make up commerce? It is only by sublimating the meaning of commerce into the naked word "intercourse," and then maintaining that this tax *interferes* with "intercourse" by making the profits of the transporter less, and consequently removing from him a portion of the incentive to business, that this tax can be construed to mean a regulation of commerce. But if the rule of interpretation taken by this court is such, that anything is a regulation of commerce which tends to diminish the profits of transportation, then there is no tax levied by a State which is not within such a construction, and therefore invalid, for all taxation interferes more or less with production and consumption. If the State cannot tax the receipts of a transportation company in proportion to the number of tons carried by it, and on which freight has been paid, then

it cannot tax the dividends declared, for the dividends are a portion of these very receipts, and derived from the same source, viz., received from traffic intended to be sent abroad. Indeed, if the plaintiffs in error be right, it is difficult to see what is left for the State to tax. It can lay no tax which will not more or less affect commerce; more or less prevent consumption; and without consumption there can be no commerce.

There must, therefore, be some point at which all will concur, that the power of a State to impose a tax which may affect commerce, by diminishing the profits of the transporter, is valid; otherwise the States would be left without a revenue. Now where does the power of Congress to regulate commerce begin, and that of the State to impose a tax cease? The decisions heretofore made by this court afford a solution to this question. Taking the definition of a regulation of commerce which we have given, we find it to mean a rule to govern intercourse. If then any act be passed by the State amounting to a *rule*, which either directly affects the goods, or the consignor or consignee, or the transportation of the goods or their sale, it can be considered a regulation of commerce. But any act of a State which taxes the business of any of its citizens, or franchise of any corporation, or their profits, and only interferes with commerce so far as to check consumption or diminish profits, does not amount to a rule to govern intercourse, and is a legitimate exercise of the rightful power of taxation never surrendered by the State to the Federal government. Taking this, then, as a standard, around which to classify the various decisions of the courts bearing on this subject, let us examine the conclusions arrived at. In *Brown* v. *Maryland*, relied on by the plaintiffs in error, a license was imposed by Maryland on every foreign importer, *before* he could break a package or sell any foreign goods. This was a *rule* which directly affected the sale of the goods, for before the sale took place it was necessary to comply with the rule, and the cost of the license was thus made a prerequisite to engaging in foreign commerce. This was held unconstitutional, because, by making a license a

prerequisite to sale, it clogged intercourse.   It was a rule which affected directly that portion of commerce which consisted in selling imported goods.   Had the State of Maryland required every merchant, at the end of every year, to pay a tax on the amount of profits he derived from his business, irrespective of what part of those profits were derived from internal trade and what came from foreign trade, can it be contended that anything in its decision leads to the inference that such a tax would have been held unconstitutional?   On the contrary, we have a decision of this court in *Nathan* v. *State of Louisiana*\* directly opposite to the idea of the unconstitutionality of such a tax as that stated.   In that case the State levied a tax on the *business* of foreign exchange brokers, and it was held constitutional.

None of the decisions of this court have ever gone so far as to interfere with State taxation, except in cases in which the tax was in such a form as to primarily be a rule to govern commerce, and only a tax in its secondary effects. Applying this test, the case of *Gibbons* v. *Ogden* ceases to bear against the right of the States to impose this tax.   That was nothing but a direct regulation of commerce by reason of its operating on every steamboat which, in the course of commerce, plied the Hudson River.   It established a *rule* to govern intercourse between the States, by giving the right to that intercourse exclusively to the grantees of the State of New York.   So also in *Almy* v. *California*, cited against us. That was the imposition by California of a stamp duty on every bill of lading of gold or silver exported.   As the bill of lading was an essential part of every consignment, such a tax was equivalent to a direct tax on the gold or silver, the payment of which was necessary before the goods could become commodities of commerce.   This was the establishment of a *rule to govern* the shipment of the particular articles.   It was a tax only in its secondary effect: primarily it was an imposition on commercial intercourse.   It had not the usual features of nearly every *bonâ fide* tax law, viz., a general im-

---

\* 8 Howard, 73.

position of duties for the raising of revenue. It singled out the articles principally exported, and by levying the tax on them showed the intention was to clog commerce, by charging on it the cost of State expenses. It was, however, decided unconstitutional by this court, on the ground that it was a duty on exports.

*Crandall* v. *The State of Nevada*, also cited against us, is a striking illustration of this test. The law then in dispute levied a tax on transportation companies, at a rate *per capita* on every passenger leaving the State or passing through it. In that case, as the State looked to the carrier after the passenger had passed beyond its limits and did not directly clog commerce by establishing a rule to govern intercourse, the court was not prepared to hold it such a regulation of commerce as was contemplated by the Constitution, and only decided adversely to the law on principles entirely distinct from all connection with its being a regulation of commerce.

In *Steamship Co.* v. *Port Wardens*,\* a law of the State of Louisiana taxing every vessel entering the port of New Orleans five dollars, without regard to any preference of service by officers of the State or pilots, was held unconstitutional. The effect of the tax was the same as though, before any vessel could enter the port, she was compelled to pay five dollars for the privilege of entering. This was a rule to govern intercourse, and, of course, fell within the clause referred to.

The *Passenger Cases* establish the same rule. They were directly based on the ground that the law in question established a rule to govern intercourse.

Looking next at cases in which the laws of the various States have been upheld by this court, it will be found that many of them, although complained of as regulations of commerce, were upheld as valid because they did not amount to a rule to govern intercourse, but merely affected intercourse secondarily, while their primary result was the exercise of a power undeniably vested in the State. And

---

\* 6 Wallace, 33.

first among these is the case of *Willson* v. *The Blackbird
Creek Marsh Co.,** decided as early as 1829, in which Chief
Justice Marshall (who had already written the opinion in
*Brown* v. *Maryland* and *Gibbons* v. *Ogden*) delivered the unani-
mous judgment of the court. In that case the bridge was
erected over a navigable stream, and entirely cut off all navi-
gation. Yet it was held to be a constitutional exercise of a
power never surrendered by the State of Delaware. Al-
though it is undisputed that the bridge interfered with inter-
course, yet as it was primarily intended as a local improve-
ment, and was an exercise of the right of the State, and its
interference with commerce was the secondary effect of its
erection, the act was lawful. It was not a rule to govern
intercourse. So also in *City of New York* v. *Miln,*† decided
eight years later. In that case, while it cannot be doubted
that the imposition of penalties by New York against the
captains of vessels failing to report the number of passengers,
was a regulation of commerce, yet as it was not a rule to
govern intercourse in its primary effect, but was the exercise
of the police power of the State in the first place, and a reg-
ulation of commerce in the second place only, it was held
constitutional. In *Groves* v. *Slaughter,*‡ the question of the
constitutionality of an act forbidding the importation of
slaves from any State into Mississippi was considered and
the act sustained. It was intended as a local police measure,
and while it might affect interstate commerce still it was
primarily an exercise of a right conceded to the State. But
stronger is the case of *Cooley* v. *Board of Wardens,*§ decided
in 1851. The law of Pennsylvania, imposing upon every
vessel entering the port of Philadelphia, which neglects or
refuses to take a pilot, a forfeit of one-half pilotage, to go
to the Society for the Relief of Disabled Pilots, was held
constitutional. " The power to regulate commerce includes
various subjects, upon some of which there should be a uni-
form rule, and upon others different rules in different locali-
ties. The power is exclusively in Congress in the former,

* 2 Peters, 245.   † 11 Id. 104.   ‡ 15 Id. 449.   § 12 Howard, 299.

but not so in the latter." The power to regulate pilots is a regulation of commerce, but as the law was primarily local in its operations, and intended, in good faith, to be an exercise of an undoubted right of the State, its secondary effect on commerce did not make it illegal, and the decision is approved in *Crandall* v. *Nevada*, decided over sixteen years later. But still more decided is *Gilman* v. *Philadelphia*, decided in 1865, and to which we have already referred.* This settled the right of a State to erect a bridge over a navigable river, even if it does interfere with navigation, provided Congress has not legislated on the subject, and that if the act of a State does not amount to a rule to govern intercourse, it may be lawfully enacted, even if it does interfere with commerce. The statement of the distinction is clearly drawn in the words of Swayne, J., who delivered the opinion. He says:

"The States may exercise concurrent power in all cases but three: 1st. Where the power is lodged exclusively in the Federal Constitution. 2d. Where it is given to the United States and prohibited to the States. 3d. Where, from the nature and subjects of the power, it must necessarily be exercised by the Federal government exclusively."

The power here in question does not fall within either of these exceptions. It is no objection to distinct substantive powers that they may be exercised upon the same subject within their respective boundaries. In some instances their action becomes blended, in some the action of the State governments displaces the action of the Nation; in others the action of the State is void, because it seeks to reach objects beyond the limits of State authority.

The distinction between interference with commerce and a regulation of commerce is clearly recognized by the court in this case, and the case furnishes an answer to the complaint that allowing the States power to interfere with interstate commerce would lead to evils in traffic.

From the various recent decisions of the court, we think

* *Supra*, p. 249.

then that it may be considered that, whatever may have been the tenor of the earlier cases, it is now settled that there are many forms of regulations which affect commerce which it is within the powers of the States to make, not excluding the cases of bridges, pilots, quarantine and police measures, all of which have been always recognized as being vested in the States as well as Congress.   That there also belongs to the States the right to pass laws which are in exercise of the reserved rights of the States, even if they be regulations of commerce, provided that the regulation be local in its nature and does not amount to a national rule, and one which uniformly affects the whole country.

Does the tax now under discussion "institute a regulation of commerce of a national character," or one which "has a uniform operation over the whole country?"   Surely the dealing between the Reading Railroad and the Commonwealth of Pennsylvania as to the taxes on its business of shipping coal from the mines to Port Richmond, in Philadelphia, is not a national regulation.   But a distinct argument of the proposition is fortunately rendered unnecessary by the decision in *Crandall* v. *State of Nevada.*   It was there held that the tax under dispute was not such a one as to come in conflict with the constitutional provision.   Now the tax in that case was similar in its operation to the one at present before the court, with the exception that the tax in the Nevada case bore much more directly on the person transported than this one does on the goods carried, and was also a discrimination against a particular class of traffic. Unlike the Nevada tax, this is uniform in its operation on all classes and makes no discrimination.   The Nevada tax and the tax in Pennsylvania present a curious resemblance, and differ only in that the former one is much stronger in its bearing against the constitutional provision than the latter.   Yet this court admitted in that case, that as the tax was not a uniform rule of the whole country, or national in its character, it was not in conflict with the constitutional restriction, Congress having failed to legislate upon the subject.   There has been no act of Congress since passed which

bears upon the subject. If, then, the tax imposed in 1867 was not unconstitutional, how can the one now before the court be so, when it is a counterpart of the former, so far as its relations to transportation are concerned?

3. *The law in question is an exercise of the power of taxation reserved to the States under the Constitution, is equal in its operation, bonâ fide in its character, making no discrimination against non-residents, and is levied on the franchise of every corporation in proportion to its business.*

A State can levy a tax on the franchises of its own corporations. This has been repeatedly decided. The State of Pennsylvania contends that under the undeniable right to tax the franchises of her citizens she has seen fit to levy this tax. The tax is payable by the company in proportion to the amount of freight carried. Now, that this is a tax on the franchise of the company is apparent, when it is remembered that all of the receipts of the great majority of railroads in Pennsylvania are derived from freight. In the case of the Reading Railroad Company, the now plaintiff in error, their business is almost exclusively a transportation business, and the value of their franchises to themselves can be graded exactly by the amount of freight carried, for almost all their receipts are derived from freight. Can it be successfully contended that the Commonwealth could not have charged a tax on the income of this company at any rate she pleased? Yet the income is derived exclusively from freight. Why, then, can she not tax the company by amount of freight carried, at so much per 1000 pounds, as well as at so much on each dollar of income received from carrying that freight. If this company got one dollar from every 2000 pounds of freight carried, could not the State levy a tax of two cents on every dollar of income, before there should be any dividend? If she could, why can she not measure the business of the company by the amount of freight, and not by the amount of receipts, and lay a tax on the franchise of the company of two cents on each 2000 pounds?

The practical effect of the tax in question is to make its

amount vary with the amount of the freight of the different transporting companies, and grades the proportion which each shall pay to the State in accordance with the value which the franchises granted to each by the State, have been to the corporation during the period covered by the tax. Not only is this a proper exercise of the power of taxation, but it is in the form which has been especially commended by this court. The question of taxation, according to the amount of business done by a corporation, came before the court in *Society for Savings* v. *Coile.**  That was a tax levied on the gross deposits of a saving bank, in its hands on a certain day. It was contended that the United States securities held by it could not be thus taxable, as they were exempt from State taxation. The court held such a tax to be on the franchise of the corporation, and sustained it. The court said:

"Different modes of taxation are adopted in different States. Fixed sums are in some instances required to be annually paid into the treasury of the State, and in others a prescribed percentage is levied on the stock, assets, or property, owned or held by the corporation, while in others the sum required to be paid is left indefinite, to be ascertained in some mode by the amount of business which the corporation shall transact within a defined period. *Experience shows that the latter mode is better calculated to effect justice among the corporations required to contribute to the public burdens than any other which has been devised, as its tendency is to graduate the required contribution to the value of the privileges granted, and to the extent of their exercise.*"

The business of transportation is as much the business of the railroad companies, as is that of receiving deposits the business of the savings bank. If, then, a tax on the total amount of deposits at a certain day, is a tax on the franchise, why is not a tax on the total amount of freight carried, a like tax on franchise? And the court held not only that such a tax was legal, but justly commended it as the most equitable that could be devised.

---

* 6 Wallace, 608; and see Provident Institution v. Massachusetts, Ib. 623.

But a stronger argument in favor of the State is found in the fact that it is a *bonâ fide* tax, levied by her to raise revenue in an equitable manner from the corporations which owe their existence to her dominion. The tax is levied upon every ton of goods carried, whether they be shipped by a citizen of Pennsylvania, of New Jersey, or any other State. The burdens fall equally heavily on all classes of business, and do not charge upon the foreign citizens a penny more than is charged upon our own. It may be that if a tax is illegal as levied against a citizen of another State, it cannot be made legal by levying it against a citizen of Pennsylvania. But the fallacy of the argument is found in confounding the cause and effect. It is not because it is a tax law that the act can be complained of. It is because it amounts to a regulation of commerce; and when we show that it does not amount to a regulation of commerce, but is a *bonâ fide* tax law, we show that it is constitutional. It is fallacious to start with the premise that it is illegal as to certain parties. The fact that there is no discrimination is evidence of good faith on the part of the State. It removes it from any suspicion of unfairness, and makes the plaintiff come here, not as injured parties seeking protection, but as a corporation seeking to escape from paying her share of a tax which must be borne by all its fellow-corporations. The effect of the tax, so far as traffic is concerned, is well stated in the opinion of the Supreme Court of Pennsylvania. It says:

" It is evident that it does not matter whence or whither these tons travel, so that there be no discrimination to forbid or to burden their entrance into or exit from the State; and being a tax on the benefit and the privilege of transportation on works constructed for this end, it bears equally on all. Nor can it make any difference, that the company is allowed to add this tax on its franchises to the tolls or charges on the freight itself. It is the owner of the freight who enjoys both the privilege and the facility this valuable franchise affords, and whose toll could be increased by the State to the same extent if the works were in her hands. It falls upon those who use the road, not because it is a regulation of commerce, but because it is a subject of in-

ternal regulation, to which he is bound to contribute.   There is in fact and authority, a substantial distinction between an act which simply operates as a burden on commerce and one which attempts to regulate it.   No one can doubt the power of a State to tax her own coal, iron, lumber, grain, and other products of her mines and soil, and the persons and occupations of those engaged in their production or their transportation, and yet these burdens eventually fall on those who consume them, whether they live in or out of the State.   Yet clearly such taxation is no regulation of commerce.   The State in laying a common tax on all such articles is not bound and cannot be presumed to know where they will be consumed, nor to inquire the destination of those who traffic in or transport them.   If she do not discriminate between that which goes out or comes in and that which remains within, it cannot be said that she in any sense attempts to regulate commerce with other States, or to impose a duty on imports or exports.   In principle, where there is no discrimination, there is no difference between a tax on a transporter, whether in gross or measured by the ton he carries, and a tax on a farmer, the manufacturer, the miner, the merchant, or the broker, measured by the business he does.   Yet all the impositions are burdens which reach the consumer wherever he lives.   The fallacy of the argument which insists that the burdens of internal transportation shall not be shared by the distant consumer, on the ground that it is an import or export duty, or a regulation of commerce, is seen in the fact that to exempt articles going out of the State, would be to discriminate in favor of the foreign and against the domestic consumer. Coal carried from the mines to Richmond, on the Delaware, and there disposed of, is conceded to be liable to the tax, but if intended to be sent forward to places without the State, it is said not to be liable; what is this but to impose a tax on our own citizens, which those beyond the State are not to bear?   Pennsylvanians are citizens of the same Union, and entitled to its equal protection against such discrimination."

The argument is weighty.   A resident of Camden, opposite Philadelphia, can have coal shipped to him from the mines, and cannot be taxed.   A resident of Philadelphia must pay the tax.   Hence it would follow that if the con-

struction contended for by the plaintiffs in error be correct, the citizens of Philadelphia, whose State has chartered the Reading Railroad, whose capital is to a large extent involved in it, whose authorities protect its mines, its property, and grant to it its franchise, could be underbid in their own market by a citizen of New Jersey, merely because he was a citizen of that State, which has nothing whatever to do with the continuance, existence, or safety of either the corporation or its property. Pennsylvania coal, from Pennsylvania mines, transported by a Pennsylvania company, could be bought in Camden cheaper than in Pennsylvania. The constitution never intended such a discrimination by a State against its own citizens. In *Padelford* v. *Savannah*,* the court said:

"It is not said in *Brown* v. *Maryland*, that the State must discriminate *in favor* of the foreigner, and not tax him when she taxes her own citizens. Now, what was the object of the prohibition? In a word, was its object to put foreigners in a better condition than natives? We know that the object was not to put citizens of another State in that better condition."

This point has already had the attention of this court in *Woodruff* v. *Parham*.† A tax was there levied on the gross sales at auction of auctioneers in Mobile, Alabama. It was proved that a large amount of the sales were of packages, unbroken, which came from Georgia. It was contended that a tax could not be levied by Alabama on these consignments. The court upheld the tax, and clearly showed that it was never intended by the constitution to discriminate against a citizen of a State and in favor of citizens of other States. Miller, J., says:

"The case of *Brown* v. *Maryland*, as we have already said, arose out of a statute of that State, taxing *by way of discrimination*, importers who sold, by wholesale, foreign goods."

But the view of the court on the subject of discrimination is yet more decidedly stated in *Hinson* v. *Lott*. In that case

---

* 14 Georgia, 438.      † 8 Wallace, 123.

Georgia levied a tax of fifty cents on each gallon of whisky brought into the State from a sister State for sale and sold in the original cask.  She, also, by the same act, levied a like tax of fifty cents on every gallon of whisky manufactured and sold in the State.  The first she collected as a tax, the latter as a license.  When the section imposing the tax on imported liquors came before the court, Miller, J., said:

"As the act institutes no legislation which discriminates against the products of sister States, but merely subjects them to the same rate of taxation which similar articles pay that are manufactured within the State, we do not see in it an attempt to regulate commerce, but an appropriate and legitimate exercise of the taxing power of the State."

So, also, in the present case.  As the tax does not discriminate against citizens of other States, but merely charges all alike, it is not an attempt to regulate commerce, but is an exercise of the taxing power of the State.

And it is a fact worthy of note, that all the research of the learned counsel for the plaintiff in error has failed to discover a single case in which this court has overturned a State tax law, which is *bonâ fide* in its provisions, which contains no covert attempt to regulate commerce, but enacts, without discrimination, a tax alike for residents or non-residents, in proportion to the business carried on under the protection of the State which imposes the tax.

If the proposition of the plaintiff in error be correct, and the goods shipped to points outside the State be free from taxation, because the tax then would be to regulate commerce, why cannot the citizens of Pennsylvania object to paying any tax on their goods, on the ground that by freeing the non-resident and charging the resident, there is an unjust discrimination against the resident?  All are citizens of one common Union, all are entitled to the same position by the Constitution of the United States.  Why, then, should the Pennsylvanian be charged two cents when the citizen of New Jersey is exempt?  Does not the State, by such a discrimination, regulate commerce, by putting the resident

at a disadvantage, and has he not a like right to claim protection? Such a defence to taxation, if good, would bankrupt the Commonwealth, by depriving her of all her revenue.

4. *This is a tax imposed by the State as compensation for the use of artificial works created by her authority, and in exercise of her right of eminent domain.*

It cannot be denied that the Commonwealth of Pennsylvania, had she seen fit, could have refused to allow the Reading Railroad to be built. It owes its existence entirely to her pleasure. No consideration of interstate traffic could have availed anything so far as to compel her to authorize its erection. And she may still destroy the Reading Railroad, and forfeit its franchises, unless restrained by the rights of the corporation. There is nothing in the shape of an authority vested in the United States courts which could for a moment restrain her from, to-morrow, tearing up every rail between Reading and Philadelphia. If, then, the power to regulate commerce vested in Congress, is not such a power as to compel the building of the road, or to prevent its destruction when the State sees fit, how can it be that the power to regulate commerce is such as to prevent the State charging the parties using the road? If she can refuse to create, if she can destroy, why can she not tax for the existence? A distinction between a tax and a regulation of commerce has been frequently recognized by this court.*

This view is thus ably stated in the opinion of the Supreme Court of Pennsylvania:

"Among the most important reserved State rights, and one directly connected with the question before us, is that of eminent domain. This undoubted power has been exercised in the improvement of navigable streams, and in building and establishing ferries over them, and in the construction of roads, turnpikes, canals, and railroads; and has been repeatedly recognized in authoritative decisions. Under this invaluable power the

---

* Passenger Cases, 7 Howard, 402, McLean, J.; 479, Taney, C. J.; Veazie *v.* Moor, 14 Howard, 568.

States have built up a network of railways and canals, and have improved natural channels through which the commerce of the whole Union is coursing, like the life-blood throughout the natural system.  This was not done under any supposed authority to regulate interstate commerce, or to aid in the execution of the Federal power over commerce between the States; but was done under the unquestioned power of the State to improve her own resources, and to regulate her internal affairs.  Yet, does any one doubt the grand and beneficial impulse given to interstate commerce by this exercise of State power?  And who can doubt that the State has a right to compensation for the expenditure of her means and the benefit she has conferred on all who use her works?  They were built by herself or under her franchises, and the right to exact tolls, charges, and fares for their use, is a necessary consequence of her power to construct them.  Nor does it make any difference what form her compensation takes—whether that of a direct charge on the tonnage using the road, or that of a tax on the corporations who use her franchises—her right is to exact the compensation from those who use her works.  To gainsay this is to deny her right of eminent domain, and her power to legislate upon her internal affairs and the creations of her own sovereignty.  If these works were, as once some of them were, in her own hands, what provision in the Federal Constitution would forbid her to increase her revenue by an increase of the charge of transportation over them?  When in the hands of creatures exercising her franchises, what clause in any instrument forbids her to tax the franchises, and authorize the tax to be added to the pre-existing tolls and charges?  To legislate once, is not to exhaust her power over the subject of tolls or charges, but to legislate at all is to assert her power.  Whether it be called a toll or tax, what is this but to increase a charge which she can rightfully demand?  The right to demand any toll or charge upon all articles transported, or fares for passage, is derived from her grant, and the power to determine their extent depends upon her discretion.  It is a right of which she cannot be deprived, and of which she is the only judge, unless, perhaps, the power should be so unreasonable and oppressively exercised, as to afford evidence of a design, by a fraudulent use of the power, to interdict or ruinously affect the commerce of other States.  To say, because her citizens engage in mining for an extraterritorial market, or because mer-

chandise may pass over these works out of or into the State, that to exact tolls and charges for the minerals or merchandise transported over them, or to tax the franchises of those engaged in the work, is a regulation of commerce, is to confound all just distinctions, and to destroy the most sacred right of a State. Her power to levy revenue from transportation over these works may be seen in her power over the works themselves. If compensation were denied her by way of revenue, who can dispute her power to suffer her own works to fall into decay and ruin; or, when unfettered by a charter contract, to repeal the charters under which they were built? Interstate commerce might suffer, but what power could control the act? Then, on what principle is it she cannot levy a tax on these instrumentalities, for the privileges granted, because the products carried are destined for points without, or from without to points within the State? It is carriage or destination which gives the right of toll, tax, or charge. It is not levied on them because the products go out or come in, but because they have the privilege and the benefit of transportation."

To this argument the plaintiffs, referring to it in anticipation, reply,* "that the rivers of Pennsylvania are not constructed by the State power of eminent domain," and that a tax is imposed on every ton transported within the territorial limits of Pennsylvania by every steamboat.

To this we rejoin, that all of the rivers in Pennsylvania (with the possible exception of a small part of the Alleghany) are, for the purpose of transportation, artificial highways. The Schuylkill, Susquehanna, and Lehigh, are all of them navigable only by reason of artificial works created at great expense, and that the evident intention of the act, as well as its practical workings, all show that it is only on companies owning artificial works, that the charge is to be made. The words of the act are too clear on the subject for argument. They read, that the "officers of every railroad company, steamboat company, canal company, and slack-water navigation company, and all other companies now or hereafter doing business in this State, *and upon whose* WORKS *freight*

---

* *Supra,* p. 245.

may be transported, whether by such company or by individuals, and whether such company shall receive compensation for transportation, for transportation and toll, or shall receive toll only, shall be," &c.   It will thus be seen that it is only on companies having *works* that the tax is charged.

*Reply.* It is argued for the State of Pennsylvania that, if the tax in question be a regulation of interstate commerce, *it is not such a regulation as Congress alone can make ; and that until Congress has legislated on the subject, the State legislation is valid.*

When we consider the circumstances which induced the people of the United States to confer upon Congress the power to regulate commerce among the several States, the evils that existed and were intended to be avoided, and the plain import of the words used in the Constitution itself, the argument is hard to maintain.

. What benefit could have been expected from investing Congress with the power to regulate interstate commerce, if the States themselves were to retain the power—the exercise of which had proved so vexatious?   It could not have been supposed that uniformity and system would be produced by introducing a new element of discord.   If the regulations established by thirteen distinct legislatures were found to be inconvenient and oppressive, the interference of another legislature would seem to have been a most unfortunate plan of relief.   The difficulty is not obviated by referring to the supremacy of the acts of Congress when constitutionally enacted.   Admit that a State regulation of commerce must fall when it comes in conflict with a Federal regulation, yet it cannot be supposed that Congress was expected to adopt a system of commercial regulation which would anticipate and preclude every possible exercise of State power on the subject.   Johnson, J., in his concurring opinion in *Gibbons* v. *Ogden*,* says:

"The history of the times will, therefore, sustain the opinion

---

* 9 Wheaton, 226.

that the grant of power over commerce, if intended to be commensurate with the evils existing and the purpose of remedying these evils, could only be commensurate with the power of the States over the subject. And this opinion is supported by a very remarkable evidence of the general understanding of the whole American people when the grant was made. There is not a State in the Union in which there did not, at that time, exist a variety of commercial regulations, concerning which it is too much to suppose that the whole ground covered by these regulations was immediately assumed by actual legislation under the authority of the Union. But where was the existing statute on this subject that a State attempted to execute? or by what State was it thought necessary to repeal these statutes? By common consent these laws dropped lifeless from their statute-books for want of the restraining power that had been relinquished to Congress."

It is true that, in the case just referred to, the decision of the court was rested upon the ground that the law of New York, which gave to Livingston and Fulton the exclusive right to navigate the waters of the State of New York, was in conflict with the laws of the United States providing for vessels to carry on the coasting trade; and this was all that it was necessary to decide. But the following extract, from the opinion of Marshall, C. J., by whom the opinion of the court was delivered, shows that the concurrent power of the States to regulate commerce was by no means recognized:

"It has been contended by the counsel for the appellant, that, as the word 'to regulate' implies in its nature full power over the thing to be regulated, it excludes necessarily the action of all others that would perform the same operation on the same thing. That regulation is designed for the entire result, applying to those parts which remain as they were, as well as to those which are altered. It produces a uniform whole, which is as much disturbed and deranged by changing what the regulating power designs to have introduced, as that on which it has operated. There is great force in the argument, and the court is not satisfied that it has been refuted."

And again, it is said by the same eminent judge, that

"When each government (State or Federal) exercises the

power of taxation, neither is exercising the power of the other. But when a State proceeds to regulate commerce with foreign nations, or among the several States, it is exercising the very power that is granted Congress, and is doing the very thing which Congress is authorized to do.   There is no analogy, then, between the power of taxation and the power of regulating commerce."

So Mr. Justice Grier said in *Norris* v. *The City of Boston*,[*] (one of the Passenger Cases),

"Congress has regulated commerce and intercourse with foreign nations and between the several States, by willing that it shall be free; and.it is therefore not left to the discretion of each State in the Union, either to refuse a right of passage to persons or property through her territory, or to exact a duty for permission to exercise it."

The idea that both Congress and the State governments may possess and exercise the right to regulate interstate commerce is as anomalous as that of the power to direct the movement of an army being lodged in several commanders at the same time.

The power to regulate commerce among the several States is given to Congress in the same clause and in the same words by which the power to regulate commerce with foreign nations is given; and any argument against the exclusiveness of this power in the one case must equally be applicable to the other.   It is impossible to suggest any distinction. The grant in each case was made in the same language and under the same circumstances.   Yet who would now contend that the State of Pennsylvania can regulate its commerce with Great Britain?

It is not proposed to examine the various cases in which the extent of the jurisdiction of Congress over foreign and interstate commerce, has been discussed by the judges of the Supreme Court of the United States.   There has been conflict of opinion on the subject.   In the opinion of McLean, J., in *Smith* v. *Turner*[†] (Passenger Case), will be found a re-

---

* 7 Howard, 464.                              † Ib., 393.

view of the previous decisions and opinions on this point. The learned judge asserts most emphatically the exclusiveness of the jurisdiction of Congress. To the same effect is the opinion of Wayne, J., in the same case, p. 410. In the course of his opinion, Judge Wayne gives a statement of the circumstances under which the case of *The City of New York* v. *Miln*,* was decided. On the question, whether the power of Congress to regulate foreign or interstate commerce in all cases and under all circumstances is exclusive, however conflicting these opinions, it may safely be stated that nothing can be found in the reported decisions of this tribunal to raise a doubt as to the unconstitutionality of any attempt on the part of the State governments to interfere with the free exchange, between the several States, of all articles that can be made the subjects of commerce, where such exchange is not in conflict with regulations established for sanitary or police purposes.

The distinction suggested by the judge who delivered the opinion of the majority of the court, in *Cooley* v. *The Board of Wardens*,† that "whatever subjects of this power are in their nature national, or admit only of one uniform system or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress," if applied to the present case would seem to conclude the question. The right of passage for persons or goods through, from, or into the several States of the Union, is one of national importance, and especially a fit subject for national regulations, and it has been regulated by being left free and untrammelled. Whether the distinction referred to is to be considered as authoritatively established, may well be doubted. It appears to have commanded the assent of the majority of the court in the case in which it was announced, and to have led to a decision in favor of the validity of our Pennsylvania pilot laws, although they were admitted to be regulations of commerce. But in the case of *The Steamship Company* v. *Port Wardens*‡ (which the other side seek

---

* 11 Peters, 102.    † 12 Howard, 311.    ‡ 6 Wallace, 31.

to evade, but a decision which was approved in *Crandall* v. *Nevada,* and *Hinson* v. *Lott,** on which they rely), we find it decided that

"A statute of a State enacting that the masters and wardens of a port within it should be entitled to demand and receive, in addition to other fees, the sum of five dollars, whether called out to perform any service or not, for every vessel arriving in that port, is a regulation of commerce within the meaning of the Constitution, and also a duty on tonnage, and is unconstitutional and void;"

and the reasoning on which this decision is based seems quite inconsistent with the theory that the States have any concurrent power to regulate interstate commerce, except so far as it may be incidentally affected by quarantine or other like provisions.

Mr. Justice STRONG delivered the opinion of the court.

We are called upon, in this case, to review a judgment of the Supreme Court of Pennsylvania, affirming the validity of a statute of the State, which the plaintiffs in error allege to be repugnant to the Federal Constitution.

The case presents the question whether the statute in question,—so far as it imposes a tax upon freight taken up within the State and carried out of it, or taken up outside the State and delivered within it, or, in different words, upon all freight other than that taken up and delivered within the State,—is not repugnant to the provision of the Constitution of the United States which ordains "that Congress shall have power to regulate commerce with foreign nations and among the several States," or in conflict with the provision that "no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

The question is a grave one. It calls upon us to trace the

---

* 8 Wallace, 152.

line, always difficult to be traced, between the limits of State sovereignty in imposing taxation, and the power and duty of the Federal government to protect and regulate interstate commerce.  While, upon the one hand, it is of the utmost importance that the States should possess the power to raise revenue for all the purposes of a State government, by any means, and in any manner not inconsistent with the powers which the people of the States have conferred upon the General Government, it is equally important that the domain of the latter should be preserved free from invasion, and that no State legislation should be sustained which defeats the avowed purposes of the Federal Constitution, or which assumes to regulate, or control subjects committed by that Constitution exclusively to the regulation of Congress.

Before proceeding, however, to a consideration of the direct question whether the statute is in direct conflict with any provision of the Constitution of the United States, it is necessary to have a clear apprehension of the subject and the nature of the tax imposed by it.  It has repeatedly been held that the constitutionality, or unconstitutionality of a State tax is to be determined, not by the form or agency through which it is to be collected, but by the subject upon which the burden is laid.   This was decided in the cases of *Bank of Commerce* v. *New York City*,* in *The Bank Tax Case*,† *Society for Savings* v. *Coite*,‡ and *Provident Bank* v. *Massachusetts*.§   In all these cases it appeared that the bank was required by the statute to pay the tax, but the decisions turned upon the question, what was the subject of the tax, upon what did the burden really rest, not upon the question from whom the State exacted payment into its treasury.   Hence, where it appeared that the ultimate burden rested upon the property of the bank invested in United States securities, it was held unconstitutional, but where it rested upon the franchise of the bank, it was sustained.

Upon what, then, is the tax imposed by the act of August 25th, 1864, to be considered as laid?   Where does the sub-

---

* 2 Black, 620.      † 2 Wallace, 200.      ‡ 6 Id. 594.      § Ib. 611.

stantial burden rest? Very plainly it was not intended to be, nor is it in fact, a tax upon the franchise of the carrying companies, or upon their property, or upon their business measured by the number of tons of freight carried. On the contrary, it is expressly laid upon the freight carried. The companies are required to pay to the State treasurer for the use of the Commonwealth, " on each two thousand pounds of freight so carried," a tax at the specified rates. And this tax is not proportioned to the business done in transportation. It is the same whether the freight be moved one mile or three hundred. If freight be put upon a road and carried at all, tax is to be paid upon it, the amount of the tax being determined by the character of the freight. And when it is observed that the act provides "where the same freight shall be carried over and upon different but continuous lines, said freight shall be chargeable with tax as if it had been carried upon one line, and the whole tax shall be paid by such one of said companies as the State treasurer may select and notify thereof," no room is left for doubt. This provision demonstrates that the tax has no reference to the business of the companies. In the case of connected lines thousands of tons may be carried over the line of one company without any liability of that company to pay the tax. The State treasurer is to decide which of several shall pay the whole. There is still another provision in the act which shows that the burden of the tax was not intended to be imposed upon the companies designated by it, neither upon their franchises, their property, or their business. The provision is as follows: " Corporations whose lines of improvements are used by others for the transportation of freight, and whose only earnings arise from tolls charged for such use, are authorized to add the tax hereby imposed to said tolls, and to collect the same therewith." Evidently this contemplates a liability for the tax beyond that of the company required to pay it into the treasury, and it authorizes the burden to be laid upon the freight carried, in exemption of the corporation owning the roadway. It carries the tax over and beyond the carrier to the thing carried. Improve-

ment companies, not themselves authorized to act as carriers, but having only power to construct and maintain roadways, charging tolls for the use thereof, are generally limited by their charters in the rates of toll they are allowed to charge. Hence the right to increase the tolls to the extent of the tax was given them in order that the tax might come from the freight transported, and not from the treasury of the companies. It required no such grant to companies which not only own their roadway but have the right to transport thereon. Though the tolls they may exact are limited, their charges for carriage are not. They can, therefore, add the tax to the charge for transportation without further authority.* In view of these provisions of the statute it is impossible to escape from the conviction that the burden of the tax rests upon the freight transported, or upon the consignor or consignee of the freight (imposed because the freight is transported), and that the company authorized to collect the tax and required to pay it into the State treasury is, in effect, only a tax-gatherer. The practical operation of the law has been well illustrated by another† when commenting upon a statute of the State of Delaware very similar to the one now under consideration. He said, "The position of the carrier under this law is substantially that of one to whom public taxes are farmed out—who undertakes by contract to advance to the government a required revenue with power by suit or distress to collect a like amount out of those upon whom the tax is laid. The only imaginable difference is, that, in the case of taxes farmed out, the obligation to account to the government is voluntarily assumed by contract and not imposed by law, as upon the carrier under this act; also, that different means are provided for raising the tax out of those ultimately chargeable with it."

Considering it, then, as manifest that the tax demanded by the act is imposed, not upon the company, but upon the

---

* *Vide* Boyle *v.* The Reading Railroad Company, 54 Pennsylvania State, 310; Cumberland Valley Railroad Co.'s Appeal, 62 Id. 218.

† Chancellor Bates in Clarke *v.* Philadelphia, Wilmington, and Baltimore Railroad Co.

freight carried, and because carried, we proceed to inquire whether, so far as it affects commodities transported through the State, or from points without the State to points within it, or from points within the State to points without it, the act is a regulation of interstate commerce.   Beyond all question the transportation of freight, or of the subjects of commerce, for the purpose of exchange or sale, is a constituent of commerce itself.   This has never been doubted, and probably the transportation of articles of trade from one State to another was the prominent idea in the minds of the framers of the Constitution, when to Congress was committed the power to regulate commerce among the several States.   A power to prevent embarrassing restrictions by any State was the thing desired.   The power was given by the same words and in the same clause by which was conferred power to regulate commerce with foreign nations.   It would be absurd to suppose that the transmission of the subjects of trade from the State to the buyer, or from the place of production to the market, was not contemplated, for without that there could be no consummated trade either with foreign nations or among the States.   In his work on the Constitution,* Judge Story asserts that the sense in which the word commerce is used in that instrument includes not only traffic, but intercourse and navigation.   And in the *Passenger Cases*,† it was said : " Commerce consists in selling the superfluity, in purchasing articles of necessity, as well productions as manufactures, in buying from one nation and selling to another, or in transporting the merchandise from the seller to the buyer to gain the freight."   Nor does it make any difference whether this interchange of commodities is by land or by water.   In either case the bringing of the goods from the seller to the buyer is commerce.   Among the States it must have been principally by land when the Constitution was adopted.

Then, why is not a tax upon freight transported from State to State a regulation of interstate transportation, and,

---

* § 1057.                          † 7 Howard, 416.

therefore, a regulation of commerce among the States? Is it not prescribing a rule for the transporter, by which he is to be controlled in bringing the subjects of commerce into the State, and in taking them out? The present case is the best possible illustration. The legislature of Pennsylvania has in effect declared that every ton of freight taken up within the State and carried out, or taken up in other States and brought within her limits, shall pay a specified tax. The payment of that tax is a condition, upon which is made dependent the prosecution of this branch of commerce. And as there is no limit to the rate of taxation she may impose, if she can tax at all, it is obvious the condition may be made so onerous that an interchange of commodities with other States would be rendered impossible. The same power that may impose a tax of two cents per ton upon coal carried out of the State, may impose one of five dollars. Such an imposition, whether large or small, is a restraint of the privilege or right to have the subjects of commerce pass freely from one State to another without being obstructed by the intervention of State lines. It would hardly be maintained, we think, that had the State established custom-houses on her borders, wherever a railroad or canal comes to the State line, and demanded at these houses a duty for allowing merchandise to enter or to leave the State upon one of those railroads or canals, such an imposition would not have been a regulation of commerce with her sister States. Yet it is difficult to see any substantial difference between the supposed case and the one we have in hand. The goods of no citizen of New York, New Jersey, Ohio, or of any other State, may be placed upon a canal, railroad, or steamboat within the State for transportation any distance, either into or out of the State, without being subjected to the burden. Nor can it make any difference that the legislative purpose was to raise money for the support of the State government, and not to regulate transportation. It is not the purpose of the law, but its effect, which we are now considering. Nor is it at all material that the tax is levied upon all freight, as well that which is wholly

internal as that embarked in interstate trade.   We are not at this moment inquiring further than whether taxing goods carried because they are carried is a regulation of carriage. The State may tax its internal commerce, but if an act to tax interstate or foreign commerce is unconstitutional, it is not cured by including in its provisions subjects within the domain of the State.   Nor is a rule prescribed for carriage of goods through, out of, or into a State any the less a regulation of transportation because the same rule may be applied to carriage which is wholly internal.   Doubtless a State may regulate its internal commerce as it pleases.   If a State chooses to exact conditions for allowing the passage or carriage of persons or freight through it into another State, the nature of the exaction is not changed by adding to it similar conditions for allowing transportation wholly within the State.

We may notice here a position taken by the defendants in error, and stoutly defended in the argument, that the tax levied, instead of being a regulation of commerce, is compensation for the use of the works of internal improvement constructed under the authority of the State and by virtue of franchises granted by the State; in other words, that it is a toll for the use of the highways, a part of which, in right of her eminent domain, the State may order to be paid into her treasury.   We are asked, if the works were in her own hands, if she were the owner of them, what provision in the Federal Constitution would forbid her to increase her revenue by an increase of the charge of transportation over them? When in the hands of creatures exercising her franchises, what clause in any instrument forbids her to tax the franchises, and to authorize the tax to be added to existing tolls and franchises?

That this argument rests upon a misconception of the statute is to our minds very evident.   We concede the right and power of the State to tax the franchises of its corporations, and the right of the owners of artificial highways, whether such owners be the State or grantees of franchises from the State, to exact what they please for the use of their ways.

That right is an attribute of ownership. But this tax is not laid upon the franchises of the corporation, nor upon those who hold a part of the State's eminent domain. It is laid upon those who deal with the owners of the highways or means of conveyance. The State is not herself the owner of the roadways, nor of the motive power. The tax is not compensation for services rendered by her or by her agents. It is something beyond the cost of transportation or the ordinary charges therefor. Having no ownership in the railroads or canals the State has no title to their income, except so far as she reserved it in the charters of the companies. Tolls and freights are a compensation for services rendered, or facilities furnished to a passenger or transporter. These are not rendered or furnished by the State. A tax is a demand of sovereignty; a toll is a demand of proprietorship. The tax levied by this act is therefore not a toll. It is not exacted in compensation for the use of the roadway; and if it were, the right to make terms for the use of the roadway is in the grantee of the franchises, not in the grantor. But, in truth, the State has no more right to demand a portion of the tolls which the grantees of her franchises may exact than she would have to demand a portion of the rents of land which she had sold. She may tax by virtue of her sovereignty, and measure the tax by income, but the income itself is beyond her reach. All this, however, is abstract and apart from the case before us. That the act of 1864 was not intended to assert a claim for the use of the public works, or a claim for a part of the tolls, is too apparent to escape observation. The tax was imposed upon freight carried by steamboat companies, whether incorporated by the State or not, and whether exercising privileges granted by the State or not. It reaches freight passing up and down the Delaware and the Ohio Rivers carried by companies who derive no rights from grants of Pennsylvania, who are exercising no part of her eminent domain; and, as we have noticed heretofore, the tax is not proportioned to services rendered, or to the use made of canals or railways. It is the same, whether the transportation be long or short. It must there-

fore be considered an exaction, in right of alleged sovereignty, from freight transported, or the right of transportation out of, or into, or through the State—a burden upon interstate intercourse.

If, then, this is a tax upon freight carried between States, and a tax because of its transportation, and if such a tax is in effect a regulation of interstate commerce, the conclusion seems to be inevitable that it is in conflict with the Constitution of the United States.   It is not necessary to the present case to go at large into the much-debated question whether the power given to Congress by the Constitution to regulate commerce among the States is exclusive.   In the earlier decisions of this court it was said to have been so entirely vested in Congress that no part of it can be exercised by a State.*   It has, indeed, often been argued, and sometimes intimated, by the court that, so far as Congress has not legislated on the subject, the States may legislate respecting interstate commerce.   Yet, if they can, why may they not add regulations to commerce with foreign nations beyond those made by Congress, if not inconsistent with them, for the power over both foreign and interstate commerce is conferred upon the Federal legislature by the same words.   And certainly it has never yet been decided by this court that the power to regulate interstate, as well as foreign commerce, is not exclusively in Congress.   Cases that have sustained State laws, alleged to be regulations of commerce among the States, have been such as related to bridges or dams across streams wholly within a State, police or health laws, or subjects of a kindred nature, not strictly commercial regulations.   The subjects were such, as in *Gilman* v. *Philadelphia*,† it was said "can be best regulated by rules and provisions suggested by the varying circumstances of different localities, and limited in their operation to such localities respectively."   However this may be, the rule has been asserted with great clearness, that whenever the subjects over which a power to regulate commerce is asserted are in their

---

* Gibbons *v.* Ogden, 9 Wheaton, 1 ; Passenger Cases, 7 Howard, 283.

† 3. Wallace, 713.

nature national, or admit of one uniform system or plan of regulation, they may justly be said to be of such a nature as to require exclusive legislation by Congress.* Surely transportation of passengers or merchandise through a State, or from one State to another, is of this nature. It is of national importance that over that subject there should be but one regulating power, for if one State can directly tax persons or property passing through it, or tax them indirectly by levying a tax upon their transportation, every other may, and thus commercial intercourse between States remote from each other may be destroyed. The produce of Western States may thus be effectually excluded from Eastern markets, for though it might bear the imposition of a single tax, it would be crushed under the load of many. It was to guard against the possibility of such commercial embarrassments, no doubt, that the power of regulating commerce among the States was conferred upon the Federal government.

In *Almy* v. *The State of California*,† it was held by this court that a law of the State imposing a tax upon bills of lading for gold or silver transported from that State to any port or place without the State, was substantially a tax upon the transportation itself, and was therefore unconstitutional. True, the decision was rested on the ground that it was a tax upon exports, and subsequently, in *Woodruff* v. *Parham*,‡ the court denied the correctness of the reasons given for the decision; but they said at the same time the case was well decided for another reason, viz., that such a tax was a regulation of commerce—a tax imposed upon the transportation of goods from one State to another, over the high seas, in conflict with that freedom of transit of goods and persons between one State and another, which is within the rule laid down in *Crandall* v. *Nevada*,§ and with the authority of Congress to regulate commerce among the States.

---

* Cooley *v.* Port Wardens, 12 Howard, 299; Gilman *v.* Philadelphia, *supra;* Crandall *v.* The State of Nevada, 6 Wallace, 42.

† 24 Howard, 169.          ‡ 8 Wallace, 123.          § 6 Id. 35.

In *Crandall* v. *The State of Nevada*, where it appeared that the legislature of the State had enacted that there should "be levied and collected a capitation tax of one dollar upon every person leaving the State by any railroad, stage-coach, or other vehicle engaged or employed in the business of transporting passengers for hire," and required the proprietors, owners, and corporations so engaged to make monthly reports of the number of persons carried, and to pay the tax, it was ruled that though required to be paid by the carriers, the tax was a tax upon passengers, for the privilege of being carried out of the State, and not a tax on the business of the carriers. For that reason it was held that the law imposing it was invalid, as in conflict with the Constitution of the United States. A majority of the court, it is true, declined to rest the decision upon the ground that the tax was a regulation of interstate commerce, and therefore beyond the power of the State to impose, but all the judges agreed that the State law was unconstitutional and void. The Chief Justice and Mr. Justice Clifford thought the judgment should have been placed exclusively on the ground that the act of the State legislature was inconsistent with the power conferred upon Congress to regulate commerce among the several States, and it does not appear that the other judges held that it was not thus inconsistent. In any view of the case, however, it decides that a State cannot tax persons for passing through, or out of it. Interstate transportation of passengers is beyond the reach of a State legislature. And if State taxation of persons passing from one State to another, or a State tax upon interstate transportation of passengers is unconstitutional, *a fortiori*, if possible, is a State tax upon the carriage of merchandise from State to State, in conflict with the Federal Constitution. Merchandise is the subject of commerce. Transportation is essential to commerce; and every burden laid upon it is *pro tanto* a restriction. Whatever, therefore, may be the true doctrine respecting the exclusiveness of the power vested in Congress to regulate commerce among the States, we regard it as established that no State can impose a tax upon freight transported from

State to State, or upon the transporter because of such transportation.

But while holding this, we recognize fully the power of each State to tax at its discretion its own internal commerce, and the franchises, property, or business of its own corporations, so that interstate intercourse, trade, or commerce, be not embarrassed or restricted. That must remain free.

The conclusion of the whole is that, in our opinion, the act of the legislature of Pennsylvania of August 25th, 1864, so far as it applies to articles carried through the State, or articles taken up in the State and carried out of it, or articles taken up without the State and brought into it, is unconstitutional and void.

JUDGMENT REVERSED, and the record is remitted for further proceedings
IN ACCORDANCE WITH THIS OPINION.

Mr. Justice SWAYNE (with whom concurred Mr. Justice DAVIS), dissenting.

I dissent from the opinion just read. In my judgment, the tax is imposed upon *the business* of those required to pay it. The tonnage is only the mode of ascertaining the extent of the business. That no discrimination is made between freight carried wholly within the State, and that brought into or carried through or out of it, sets this, as I think, in a clear light, and is conclusive on the subject.