THE PULLMAN SOUTHERN CAR COMPANY *v*. JAMES L. GAINES, Comptroller.

## October Term, 1877.

TAXATION—PRIVILEGE-TAX ON SLEEPING-CARS.—A privilege-tax on the running and using of sleeping-cars on railroads in this state, not owned by the railroads, is constitutional and valid, although the owner may be a foreign corporation, and the cars may be used for the accommodation of passengers travelling through the state.

*Judge Lochrane*, for complainant.
*Heiskell*, for defendant.

THE CHANCELLOR:—By the act of March 16, 1877, ch. 16, sec. 6, it is enacted by the Legislature of this state: "That the running and using of sleeping-cars or coaches on railroads in Tennessee, not owned by the railroads upon which they are run or used, is declared to be a privilege, and the companies owning and running or using said cars or coaches are required to report, on or before the first day of May of each year, to the comptroller, the number of cars so used by them in this state; and they shall be required to pay the comptroller, by the first of July following, $50 for each and every of said cars or coaches used, or as run over said roads; and if the said privilege-tax herein assessed be not paid as aforesaid, the comptroller shall enforce the collection of the same by distress warrant."

Under this act, the comptroller of the state claims the right to collect the tax for the year 1877 on sleeping-cars

for the privilege of being run and used on railroads in this state. On the other hand, the Pullman Southern Car Company having, under protest, paid the taxes in part on sleeping-cars owned by them, insists upon the right to recover the amount as illegally exacted. Under these circumstances, the parties have made an agreed statement of facts, and propose, in that form, to submit to the decision of the courts the questions involved in the conflicting claims.

The Pullman Southern Car Company is a corporation created by the laws of the state of Kentucky. It owns the cars sought to be taxed, and the patents under a combination of which the berths used by passengers are made up. Six of these cars are assigned to the Nashville and Chattanooga Railroad Company, by a written contract similar to a contract with the Louisville and Nashville Railroad Company, made a part of the agreed case. The Pullman Company has other cars assigned, under like contracts, to the Louisville and Nashville Railroad Company, the Mobile and Ohio Railroad Company, and other railroad companies incorporated by other states, and these cars run through the state of Tennessee, en route with connecting lines running from and into other states, carrying railroad passengers. The Pullman Company sells the use of its berths only to the railroad passengers, and the cars are carried over the railroads in this state by the locomotives of the railroad companies, in trains of cars belonging to said companies, the conductors and porters on the sleeping-cars being under the control of the officers of the railroad company over whose line they are passing. The contracts between the Pullman Company and the railroad companies are made to afford facilities of sleeping to the railroad passengers, while travelling, for gain or profit to the said Pullman Company. The sleeping-cars are used for continuous routes over connecting railroads through several states, as well as travel from point to point within the state. They are passing and repassing through this state, not abiding in

it, except those assigned to the Nashville and Chattanooga Railroad Company.  The routes over which they run are made up by arrangement of the railroad companies who agree to the establishment of the connecting lines, and, by contract with the Pullman Company to obtain the cars to equip the lines so established.  The railroads to which sleeping-cars are assigned charge connecting and through lines three cents per mile for the use of said cars running over said through lines, which sum is paid to the railroad company, and not to the Pullman Company.  In the same way, railroads charge connecting lines a certain rate per mile on all freight cars running over such roads, known as mileage.

The substance of the agreed facts is, that the Pullman Company, a foreign corporation, by contract with railroad companies, foreign and domestic, furnishes the latter with sleeping-cars for the accommodation of passengers travelling in and through the state, to be carried over the railroads of this state in trains of cars belonging to the railroad companies, by locomotives of such companies, under the control of the officers of such companies, the berths, or their use for sleeping, being sold by the Pullman Company, for its profit, to the passengers on said trains.  A certain number of these cars abide in the state ; the residue merely pass through both ways, accommodating passengers who come into the state, or go out of the state, or go through the state, as well as those the *termini* of whose voyage may be entirely within the state.  What portion or proportion of travellers thus accommodated fall within either of these classes does not appear.  So, although it appears that the sleeping-cars assigned to one railroad company may be run over another railroad, by a mileage contract between the railroad companies, it does not appear what proportion of the running is upon the road of the company contracting with the Pullman Company, and what upon other roads.

By the act of 1877, " the running and using of sleeping-cars or coaches on railroads in Tennessee, not owned by

the railroads upon which they are run or used, is declared to be a privilege, and the companies owning and running or using said cars or coaches are required to report," etc. The act does not embrace sleeping-cars owned by a railroad company, and run as a part of its train. It does not cover sleeping-cars thus owned and run upon connecting lines by contract between the railroad companies, on payment of mileage, for such cars would be owned by one of the railroad companies upon whose road it is run or used. But the act was intended to tax as a privilege the "running or using" of sleeping-cars for profit by the owner of such cars, other than the railroad company who may actually own while running them. The "running and using" of the first part of the clause of the act mean the same as the "running or using" of the latter part of the clause. It is the use of a car for sleeping purposes, and for profit, which constitutes the privilege. The privilege, it should be noted, is not in the use of the car for simple transportation or travel, but in its use for lodging. Pretermitting, for the moment, all collateral matters, and reducing the problem to its simplest elements, the question is, Can the state tax, as a privilege, the furnishing of sleeping accommodations to passengers on a railroad train?

Thus put, there can, of course, be only one answer. If to the accommodation thus afforded be added meat and drink, as is done on the great iron highway across the continent, we would have on wheels the inn in its latest development. In its earlier form, like the caravansary of the East to this day, it was limited to lodging the wayfarer. And perhaps the most archaic form of the excise, license, or privilege tax was upon the hostel for man and beast.

The Constitution of this state having, in express terms, conferred upon the Legislature the power to tax privileges, it has always been held by the courts that the Legislature may tax avocations, by prohibiting them in general by the law, and then granting a license or permission to pursue

them to those who will pay a tax therefor. A privilege, says our Supreme Court, is the exercise of an occupation or business which requires a license from some proper authority designated by a general law. *Robertson* v. *Heneger*, 5 Sneed, 257 ; *Mabry* v. *Tarver*, 1 Humph. 94 ; *French* v. *Baker*, 4 Sneed, 195 ; *Mayor, etc., of Columbia* v. *Guest*, 3 Head, 414. Such was the fixed judicial interpretation of the word " privileges " when the Constitution of 1870 adopted exactly the same language, and the subsequent decisions have merely repeated the previous rulings. *The State* v. *Schlier*, 3 Heisk. 283 ; *Jenkins* v. *Ewin*, 8 Heisk. 475. And these decisions are all in accord with the current of authority. Cooley on Tax. 21, 385.

The learned counsel for the Pullman Company, in his ingenious, interesting, and able argument, while conceding these elementary principles, sought to avoid them by laying stress upon the incident that the use of the cars would not be a taxable privilege if the cars were owned by the company. He laid great stress upon the fact that the tax was dependent upon non-ownership either of the cars or of the road. And he asks, if the running and using be not a business or occupation when the cars are owned by the company, how can they be when owned by another? Read literally, the act does seem to lay stress upon the ownership of the cars, and to make such ownership an element in the privilege. But this is clearly not the meaning of the Legislature. It is the business or occupation of using the cars for the accommodation of the passengers, and for profit, which constitutes the privilege. The ownership is thrown in, not as an element of the privilege, but as a limitation upon the persons exercising the privilege who may be taxed. It is used to exempt a particular class of owners from the burden of the tax. And the only question which can be made is, not whether the business is not properly declared a privilege, and properly taxable under our Constitution and laws, but whether the exemption deprives it of its character

of a general law, and makes it amenable to the constitutional objection of being a partial law. It is obvious, however, that the Legislature merely intended, by the language used, to exclude the idea of interfering with the franchises of the railroads, granted by their charters. The right to carry passengers is thereby conceded to them, and without restrictions as to the accommodations they may choose to afford, provided they use their own conveyances for their own profit. The law presumes that the railroad company has paid, in taxation and otherwise, for the franchises thus conceded. Yet these franchises cannot confer upon them the right to concede to others the exercise of privileges exempt from the ordinary incident of property and occupation, namely, taxation. It is precisely like the case which occurred under the old law in this and other states, when a license to an inn covered the sale of liquors, for the sale of which, independently, a separate license was required. The license to the innkeeper would exempt him from the separate license, but would not authorize him to exempt a third person, the actual owner of the stock, who might undertake to run a drinking-saloon under his roof. It does not follow, however, that the two vocations might not be separated, and a separate tax imposed upon each. And, in that view, it may be that although the railroad company is exempt under the present law when the owner of the sleeping-car, it might, nevertheless, be charged with the tax for exercising the privilege in such case, if the Legislature should so determine.

It is also argued that the railroad companies contract for the use of the sleeping-cars; that these cars are drawn by the locomotives of the company, and under the control of its officers. This is true. But the agreed facts concede that the Pullman Company own the cars, and use them for the accommodation of the passengers, for purposes of profit. The use for the specific purpose, as we have seen, is the essential element of the privilege, the ownership fixing the

party to be taxed.   The "running" of the cars, coupled with the using in the first part of the section by the conjunction "and," is separated by the disjunctive "or" a little further on, and means, doubtless, consent in the running.   The contract with the railroad company in no way affects these elements.   Whether stationary or in motion, the sleeping-cars are the property of the Pullman Company, and used by that company, in the only mode which constitutes the privilege, for its own profit.   The fact that it is attached to the train, and hauled by the locomotive of the company with which it has made a contract, or of another company with which the contracting company has made a different and independent contract, is incidental and immaterial.

It may be added, in this connection, that the interchange of cars, whether freight, passenger, or sleeping-cars, between railroads, is provided for by law, and would be conceded as a convenience of transportation in the absence of any law. The state would find its interest in yielding to the usage in the common convenience to its citizens.   But if any railroad company should undertake to exercise its franchises by using the cars of others exclusively on bailment, or by permitting third persons, the owners of cars, to use them on its road for their own profit, there would be nothing to prevent the Legislature from subjecting such cars to the common burden of taxation, either as property, or by a license-tax for the privilege of so using them.

So far as those sleeping-cars are concerned which abide in this state, there can be no doubt that the tax under consideration is constitutional and legal.   It has been earnestly and ably pressed, however, that the tax, so far as it relates to cars which merely pass through the state, is amenable to the objection that it interferes with interstate commerce, and is, therefore, unconstitutional and void.   The power to regulate commerce between the states is expressly conceded to the Congress of the United States, and the freedom of

such commerce from state interference is one of the most important benefits of the Union. The right of free transit of persons without reference to state lines is made to rest upon other provisions of the Constitution, is even more important than the transit of articles of commerce, and equally inviolable by the states. *Crandall* v. *Nevada*, 6 Wall. 35.

" The taxing power of the state is one of its attributes of sovereignty. And where there has been no compact with the Federal government, or cession of jurisdiction for the purposes specified in the Constitution, this power reaches all the property and business within the state, which are not properly denominated the means of the general government; and it may be exercised at the discretion of the state. Whatever exists within its territorial limits in the form of property, real or personal, with the exceptions stated, is subject to its laws; and also the numberless enterprises in which its citizens may be engaged. These are subjects of state regulation and state taxation, and there is no Federal power, under the Constitution, which can impair this exercise of state sovereignty." *Per* McLean, J., in *Nathan* v. *Louisiana*, 8 How. 82, 83. A state, says the same eminent judge, cannot regulate foreign commerce, but it may do many things which more or less affect it. It may tax a ship or other vessel used in commerce, the same as other property owned by its citizens. It may tax the stages in which the mail is transported. *Passenger Cases*, 7 How. 402. The same language is repeated in *Morgan* v. *Parham*, 16 Wall. 475. States may tax property whether it belongs to residents or non-residents, says the same high court, in *Ward* v. *Maryland*, 12 Wall. 428. " The subjects of taxation," says Mr. Justice Field, " are persons, property, and business. Whatever form taxation may assume, whether as duties, imposts, excises, or licenses, it must relate to one of these subjects." * * * " And the amount of taxation may be determined by the value of the property, or its use, or its productiveness. It may touch business in the almost

infinite forms in which it is conducted, in professions, in *commerce*, in manufactures, and in *transportation*. Unless restrained by provisions of the Federal Constitution, the power of the state as to the mode, form, and extent of taxation is unlimited, where the subjects to which it applies are within her jurisdiction. Corporations may be taxed, like natural persons, upon their property and business." And where the property is within the jurisdiction, and enjoys the protection of the state government, it is justly taxable, and it is of no moment that the owner, who is required to pay the tax, resides elsewhere. *Tax on Foreign Bondholders*, 15 Wall. 321. " We think it may safely be asserted," says Mr. Justice Strong, " that the states have authority to tax the estate, real and personal, of all their corporations, including carrying companies, precisely as they may tax similar property when belonging to natural persons, and to the same extent. We think, also, that such taxation may be laid upon a valuation, or may be an excise, and that in exacting an excise-tax from their corporations, the states are not obliged to impose a fixed sum upon the franchises, or upon the value of them, but they may demand a graduated contribution, proportioned either to the value of the privilege granted, or to the extent of their exercise, or to the results of such exercise. No mode of effecting this, and no forms of expression which have not a meaning beyond this, can be regarded as violating the Constitution." *State Tax on Railroad Gross Receipts;* 15 Wall. 293.

These rulings of the Supreme Court of the United States, repeated in so many cases and by so many of the eminent' judges of that tribunal, leave not a particle of doubt that the state is clothed with the power, unrestrained by any thing in the Federal Constitution, to tax the property of a foreign corporation, used within its borders for the conveyance of persons or property, or even the United States mail; that such taxation may be laid upon a valuation, or may be an excise on the privilege of using it in that mode; and that, in

exacting an excise tax, it may impose a fixed sum upon the property or franchise, or proportion the contribution to the value of the privileges granted, the extent of their exercise, or the result of the exercise, and no mode of effecting this can be regarded as violative of the Constitution. *Primâ facie*, therefore, the tax in controversy is clearly valid, and it is incumbent upon the party resisting it to point out wherein the Federal compact is affected. We start out with the settled proposition that the property of the Pullman Company, a foreign corporation, used in this state, may be taxed as property, or by an excise on its use. In what respect is the tax under consideration amenable to constitutional objection?

The difficulty of drawing the line between constitutional and unconstitutional taxation by the state, both in the matter of foreign and domestic commerce, has been always recognized by the Supreme Court of the United States. That court has declined the task of defining the line in advance, preferring to leave each case to be determined upon its own facts. But the two most recent cases on the subject (*Case of the State Freight-Tax*, 15 Wall. 232, and *Case of the State Tax on Railway Gross Receipts*, 15 Wall. 284) seem to settle that the tax must be directly upon the object of commerce, or be directly aimed at commerce, in order to sustain a constitutional objection. A tax upon the vehicle, the business, or the proceeds of commerce will be good. "In the second of the cases cited," says Chief Justice Waite, "the whole court agreed that a tax on business carried on within the state, and without discrimination between its citizens and the citizens of other states, might be constitutionally imposed and collected." And the court held, in the case in which the chief justice makes this statement, that a license-tax on business carried on within the state was unobjectionable, although the business licensed "included transportation beyond the limits of the state, or rather the making of contracts within the state for such transportation beyond it." "It was no more a tax," he adds, "upon

interstate commerce than a general tax on drayage would be because the licensed drayman might sometimes be employed in hauling goods to vessels, to be transported beyond the limits of the state." *Osborne* v. *Mobile*, 16 Wall. 481, 483. The tax under consideration is as free from constitutional objection as the tax on the rolling-stock of the railroad, or an excise on the privilege of carrying passengers by rail.

Judgment must be entered for the defendant, in conformity with the agreement of the parties.