# WILLIAM KACISER *v.* ILLINOIS CENTRAL R. R. CO.

*(U. S. Circuit Court, Southern District of Iowa—October, 1883.)*

CONSTITUTIONAL LAW—REGULATION OF COMMERCE AMONG THE STATES —STATE STATUTE.    A statute of Iowa fixing the maximum rate to be charged by railroad companies for carrying freight within the State, is invalid in so far as by its terms it applies to through shipments from points within the State to points without the State, because it is a regulation of commerce among the States, and if upheld would enable the State to discriminate against the commerce of other States.

By an act of the General Assembly of Iowa, approved March 23, 1874, a tariff of maximum charges was provided for the transportation of freight and passengers by railroad. The act, by its terms, applies to "all railroad corporations organized or doing business in this State, their trustees, receivers or lessees." It provides that "all railroads in this State shall be classified according to the gross amount of their respective annual earnings within the State per mile for the preceding year," and for separate tariff of rates for each class. It also provided that the tariff of rates so established shall "be considered a basis on which to compute the compensation for transporting freight, goods, merchandise or property over any line of railroad within this State."

This suit is brought to recover damages for overcharges upon freight shipped from points in Iowa to points in Illinois and Wisconsin over a part of defendant's road in Iowa and over connecting lines in the other States named. The answer sets up, among other things, that the statute above named neither had, nor was intended to have any extra territorial operation beyond the limits of Iowa, and neither had nor was intended to have any application to, or effect upon contracts, either expressed or implied, for the conveyance of persons or property from a point in one State to a point in another State. Plaintiff demurs to this answer, and the principal questions discussed by counsel are:

*First*—Did the act, by its terms, apply to inter-State commerce?

*Second*—If so, is it constitutional?

McCrary, Circuit Judge.

There may be room for doubt as to whether the act of 1874, by its terms, applies to inter-State commerce. If it be construed as in *pari materia* with the subsequent act of the Sixteenth General Assembly (1876) "for the relief of certain railroad companies, their agents and employees," there is, I think, sufficient ground for holding that it was only intended to regulate such transportation as was carried on within the State. The latter act provides for releasing railroad companies from liability for having violated the act of 1874, upon certain conditions. Among these conditions was a requirement that such

railroad companies should enter into bonds with security, conditioned that they would not seek to evade the provisions of the act of 1874 "by increasing or contriving any increase on through rates to points on its line outside of the State." If the original act itself was intended to apply to through shipments between points in this State and points in other States, it is difficult to see how it could have been evaded by increasing such rates. It is plain, therefore, that the Legislature understood and construed the original act as applicable only to local or State commerce, and sought, by the supplemental act above mentioned, to induce railroad companies to bind themselves by contract not to increase their charges upon inter-State commerce for the purpose of making up for their losses under the law upon State commerce. If, however, the statute shall be held by its terms to apply to inter-State commerce, I am of the opinion that it is in contravention of Art. I, Sec. 8 of the Constitution of the United States, which confers upon Congress the power "to regulate commerce with foreign nations and among the several States."

The question is one of great importance, and, in some of its aspects, not free from difficulty. It has been much discussed in the Courts of the country, and especially in the Supreme Court of the United States. The following propositions may now be laid down as settled, at least so far as the Federal Courts are concerned:

*First*—The transportation of merchandise from place to place by a railroad is commerce.

*Second*—The transportation of merchandise from a place in one State to a place in another is "commerce among the States."

*Third*—To fix and limit the charges for such transportation is to regulate commerce.

*Fourth*—A statute fixing or limiting such charges for transportation from places in one State to places in other States, is a regulation of commerce among the States.

*Fifth*—The power to regulate such commerce is vested by the Constitution in Congress.

*Sixth*—This power of Congress is exclusive, at least in all cases where the subjects, over which the power is exercised, are

in their nature national or admit of one uniform system or plan of regulation.

*Seventh*—The State cannot adopt any regulation which does or may operate injuriously upon the commerce of other States.

These general propositions are abundantly sustained by the following, among other authorities:    *Crandall* v. *Nevada*, 6 Wall., 35; *Passenger Cases*, 7 How., 283; *Gibbon* v. *Ogden*, 3 Wheat., 1; *Case of State Freight Tax*, 15 Wall., 232; *Welton* v. *Missouri*, 90 U. S., 279; *Hall* v. *De Cuir*, 95 U. S., 497; *Railroad Company* v. *Husen*, 95 U. S., 469; *Pensacola Telegraph Company* v. *Western, etc., Telegraph Company*, 96 U. S., 9; *Carton* v. *Illinois Central Railroad Company*, (1 Supreme Court of Iowa,) 13 N. W. Rep., 67.

It is insisted by plaintiff's counsel, in their very able and exhaustive argument in this case, that, conceding the soundness of these propositions, the statute in question may be upheld upon the ground that in enacting it the State exercised a power which is vested concurrently in the States and the General Government.    That certain powers may be exercised by the States in the way of regulating inter-State commerce, where no act of Congress is interfered with, may, for the purposes of this case, well be admitted.    Assuming such to be the law, the questions remain:

*First*—Whether the act in question, if applied to through shipments of freight upon lines extending into or through the several States, must not be held to relate to a subject which is in its nature national, or which admits of one uniform system or plan of regulation?

*Second*—Whether, if the power of the State to pass such an act be conceded, it does not necessarily include the power to discriminate against the commerce of other States?

If either of these questions is answered affirmatively, then the statute, in so far as it relates to through shipments over inter-State lines, is in violation of the Federal Constitution. I am of the opinion that both questions must be so answered. It seems very obvious that the regulations of transportation or merchandise over a line extending, it may be, from the Atlantic to the Pacific ocean, is a subject which is in its nature national.    It is so because it necessarily concerns the people of

the whole country, and is beyond the legislative power of any single State.   It is also apparent that such transportation not only admits of, but requires a uniform system or plan of regulation.   I do not understand the plaintiff's counsel as denying these propositions; but he insists that this State may regulate charges upon so much of the route as lies within its own territory.   In other words, the contention of counsel is, that each State over whose territory a line of inter-State railroad passes may fix or limit the charges to be made for the carriage of a cargo upon that part of the route which lies within its own jurisdiction.   The consideration of this proposition involves a determination of the second question last above stated, viz: Whether the statute in question construed as authorizing the regulation of charges within this State, may not affect charges made for carriage in other States.   To state the question in another form, it is this: Can each of the States through which a cargo must pass, in going, for example, from Des Moines to New York City, fix the proportionate charge which shall be made by the carrier for the distance within its own territory? Such a line would pass through portions of the States of Iowa, Illinois, Indiana, Ohio, Pennsylvania and New York.   How can Iowa fix the amount to be paid for the carriage from Des Moines to the State line without indirectly affecting the rates to be charged in other States? · It must be borne in mind that the power to regulate includes, not only the power to reduce, but the power to increase charges.

If one of the States upon such a line can fix the charge for carriage within its own territory, what is to prevent it from authorizing its own carriers to demand and receive an undue and unreasonable proportion of the gross amount?   If the proposition contended for be admitted, what is there to prevent the three States through which the cargo must first pass on its way to New York, from exacting more than one-half of the charge for the entire route?  Or, to state the same question in another way, why may not the five States through which the cargo would pass before reaching the boundary of New Yerk, exact, in the aggregate, the whole of a reasonable charge for the entire route, leaving nothing for the carrier within the State of New York?   And since no State law can have any

extra territorial force, is it not clear that the attempt to enforce the statutes of each of the several States, in so far as the carriage within such State is concerned, would lead to conflicts and disputes which no State authority would be competent to adjust and determine? These considerations, I think, lead inevitably to the conclusion, not only that such commerce is the subject only of national control and regulation, but that any attempt to devolve upon a single State the power to regulate it in part, would necessarily give to such State the right to discriminate against other States of the Union. It is well known that one of the chief reasons which caused the constitutional convention to insert the commercial clause in the Constitution of the United States, was the belief that if the power to regulate commerce among the States, was not taken exclusively into the hands of the National Government, rivalries and jealousies would arise among the States similar to those which had existed under the old confederation, which would lead practically to the destruction of inter-State commerce, and it was regarded as specially important that no power in the Legislature of any one State, to interfere with commerce or trade in any other State, should be recognized as existing. My conclusion is, therefore, that the statute in question, if held to apply to interState commerce, is in violation of the Constitution of the United States. In this view I am supported by the recent decision of the Supreme Court of this State, *Carton* v. *Ill. Cent. R. Co., supra,* in which the act now under consideration was held to be unconstitutional. If I were in doubt upon the subject, I should not hesitate to follow that ruling. I am not aware that the Federal Courts have ever in the course of our history, undertaken to enforce in this tribunal any act of the State Legislature, which the Supreme Court of the State has held for any reason to be null and void. To do so would be to give to suitors who can come here, an unjust advantage over the citizens of the State, who are compelled to submit their rights to the determination of the State Courts.

The demurrer to the answer is overruled.

—*Chicago Legal News.*

# THE UNITED STATES *v.* THE SOUTHERN COLORADO COAL AND TOWN COMPANY.

*(United States Circuit Court, Colorado District, October Term, 1883.)*

1. EVIDENCE—NEGATIVE AVERMENT.   A plaintiff who in his complaint makes the basis of his suit to consist of negative averments, takes the burden to show that, at least *prima facie*, they are true.

2. SAME—SAME.   In suit to set aside patent on the ground of conspiracy and fraud, and that the pretended grantors were fictitious, and never entered the lands nor resided in the county, proof by a large number of witnesses, who were in a position to know, that no such persons resided in the county or upon the lands at the time, is sufficient to shift the burden and make it necessary for those claiming under such supposed grantors to establish their existence.

3. FICTITIOUS GRANTEE.   A grantee is as necessary to the conveyance of land as the grantor.   Hence, a grant to a fictitious person is simply void.

4. SAME—CLAIMANTS UNDER.   Those claiming under such fictitious grantee are not protected as innocent purchasers for value, for the reason that the original patents were absolutely void, and so no title passed from the United States, and of course none to those claiming under the grantees in such void patents.   A person who has acquired title by fraud may make a valid conveyance to a *bona fide* purchaser; but one who has never acquired title cannot convey it.

5. LACHES cannot be imputed to the Government.   After a lapse of time sufficient to raise the presumption that witnesses are all dead, a Court of equity may, on that ground, refuse to entertain the controversy.

6. ESTOPPEL.   The United States is not estopped by the frauds of its public officials.

McCRARY, Circuit Judge.

The important allegation of the bill is, that the patentees named in the patents sought to be set aside—sixty-one in number—as well as the witnesses by whom proof of pre-emption purports to have been made, were all fictitious persons, having no existence in fact.   It is averred that the pre-emption papers, together with the signatures thereto, were fraudulently manufactured by certain conspirators named, or other persons unknown, for the purpose of cheating and defrauding the complainant out of its title to the lands in question.   In other words, the contention of the complainant is, that the officers of the General Land Office were by fraud induced to execute

Vol. IV–No. 11

patents to fictitious persons, so that there were in fact no grantees capable of taking title. We will first inquire whether the proof sufficiently shows that is true as a matter of fact.

The bill sets out the names of supposed pre-emptors and patentees, to the number of sixty-one, and charges the same are fictitious persons, and that the names are fictitious names; that no persons by such names ever have lived or been known to the county of Las Animas, Colorado, where said lands are situated. It also sets out the names of persons purporting to have appeared as witnesses in these several cases, and makes the same averments as to them.

Although these averments are negative in character, yet as the complainant has made them the basis of its suit, the burden is upon it to show that they are at least *prima facie* true. Greenleaf, Sec. 78; Wheaton on Evidence, Chap. 7.

The complainant accordingly called fourteen witnesses, who have resided in Las Animas county for a number of years, and who testify that they were well acquainted there, at, before and since the dates of several patents, and that during the years from 1870 to 1874 none of the persons named as patentees, with the exception of Juan B. Martine, were known to the county; and as to Martine, the proof is that a common laborer was known in Trinidad of that name, but that he never occupied any of the land in question. It is not probable that he was an actual pre-emptor if all the other sixty were myths. It clearly appears by the evidence that none of the lands were occupied or in any way improved prior to the issuing of the patents, although in each case what purports to be an affidavit of the claimant, is filed, setting forth that he is a citizen of Las Animas county, and has made settlement on and improved the land in good faith, etc., describing the improvements.

The proof is very clear, that, with the possible exception of Martine, no such persons as those named as patentees either occupied the land or resided within the county at the time that the pretended entries were made. It was then a very new county, but sparsely populated, and it is incredible that so large a number of persons could have lived in the community and that all could have been unknown to the leading citizens.

At all events, the proof produced by the complainant is sufficient to shift the burden and make it necessary for respondents to come forward with proof to show that these patentees were real persons.  If such be the fact, it would have been easy for respondents to show it, although quite difficult for complainant to prove the negative.  If sixty-one persons bearing the names of these parties ever existed and actually appeared before the land officers at Pueblo, applicants for pre-emption, and if they produced living witnesses to testify for them, it certainly would not be difficult for respondents to identify them, or at least some of them; but if they never existed, it must, in the nature of the case, be difficult, if not impossible, to prove the fact of their non-existence by clear and positive evidence.   All that is possible in such a case is to call as witnesses those who would probably have known them, if they had lived at the time and place in question.  The fact of their non-existence could be proved in no other way.   It is suggested in the argument that the proof is insufficient, because it only goes to show that none of the patentees or witnesses ever lived in Las Animas county, and does not tend to prove that they did not exist elsewhere.  It would, however, be manifestly impossible for the plaintiff to call witnesses to testify as to all localities; and besides, each of the supposed patentees must have resided in Las Animas county, and actually occupied and improved the land patented to him, in order to be entitled to a patent at all, and each was required to swear to such residence, occupancy, and improvement.  If none of them were ever in the county, and no improvements were ever made upon the land, then the proofs upon which the patents issued were false, and the inference that the papers were manufactured without the presence of any persons bearing or assuming the names of the patentees, is not more unreasonable than would be the inference that sixty-one actual persons committed perjury themselves, and subpœnaed as many others to perjure themselves as witnesses, in order to acquire the title.  At all events, I am clearly of the opinion that complainant can be required to do no more than to show that the supposed patentees did not live in Las Animas county, and that the lands in question had neither been occupied nor improved.  If this

is not sufficient to shift the burden, then it must follow that we should require the complainant to make the same showing with respect to every other community in the United States, and this can scarcely be insisted upon. It would be very difficult to prove that these supposed persons did not exist in all space. "But jurisprudence has to do with no such vague domain. Its territory is limited. It inquires whether, in a particular spot, at a particular time, open to human observation, a particular thing existed.   *   *   *   It is possible within such limited range, to call all witnesses who were likely to have been at the given spot, at the particular time, and so to approach the negative by generally exhausting the affirmative." (Wharton on Evidence, Sec. 356.) The amount of proof requisite to support the negative proportion and to shift the burden will vary according to the circumstances of the case; and very slender evidence will often be sufficient to shift the burden to the party having the greatest opportunities of knowledge concerning the fact to be inquired into. (Digest of the Law of Evidence, Stephen, article 96). In the present case, to hold the respondents bound to produce evidence in support of the affirmative of the proposition—that these supposed patentees were actual persons—is, under the circumstances, both reasonable and just, because the proof of that fact, if it be a fact, is within their reach. The papers could not have been fabricated, as alleged, in the names of fictitious persons, without the knowledge of the Register and Receiver of the Land Office at Pueblo, and the bill distinctly charges that both these officers were parties to the fraud and conspiracy. What purports to be transfers from each of the supposed patentees to one Jackson, as trustee for the Colorado Coal and Town Company, are shown in evidence. Jackson, however, swears that he dealt only with one A. C. Hunt, who brought him the Receiver's certificate properly signed, and he never saw or knew any of the pre-emptors or patentees. He bought the lands from Hunt and paid him for them, receiving what appeared to be the usual evidence of title. It is fair to presume that Hunt dealt with the actual pre-emptors. If any existed, or if he did not, he could state with whom he did deal, and thus put the inquirer on the road which would lead him to the original

parties, if any such parties actually existed.    It is conceded that the Receiver is dead, but no reason appears for not calling either the Register or Hunt; and the failure to do so is a circumstance the significance of which the Court is not at liberty to overlook.    If the Court could suppose that an innocent official, thus accused by a bill filed by the Attorney General of the United States, would fail to demand, or at least request, opportunity to vindicate himself under oath, it would be impossible to doubt that the respondents would have called him if the truth had been otherwise than as the bill alleges.    It is insisted that it was the duty of the complainant to call these witnesses; but the Court does not think so.    The complainant having charged these persons with fraud and conspiracy, should not be driven to the necessity of calling them as its witnesses if it is possible for it to make out a *prima facie* case without doing so.    The respondents, whose defense rests, at least in part, upon a denial of the charge of fraud and conspiracy made against these persons, could with perfect safety have called them if the charge is false.

Thus far no notice has been taken of the testimony of experts upon the question whether the signatures to the papers in question appear to be genuine signatures of different persons.    The opinions of the expert witnesses differ, as is usual in such cases; but in my judgment this testimony, considered as a whole, confirms the theory that the papers were fabricated.

Having thus reached the conclusion that the supposed patentees in each and all the patents sought to be set aside were fictitious persons, having no existence, it only remains to determine what the consequences are with respect to the present respondents.    And for the purposes of this inquiry I will assume that it sufficiently appears that respondents had no actual notice of any participation in the frauds whereby the patents were obtained.    The rule of law that a grantee capable of taking the title is necessary to the validity of a deed, is elementary.    A grantee is as necessary to the conveyance of land as a grantor, and it follows that a grant to a fictitious person is simply void. 3 Washburn on Real Property, 4th Ed., 265; *Muskingum Turnpike* v. *Ward*, 13 Ohio, 120; *Hulich* v. *Scovil*, 4 Gil. (Ill.), 175.

"By the common law all grants between individuals must be made to a grantee in existence, or capable of taking; otherwise there could be no such thing as livery of seisin." *Miller* v. *Chittenden*, 2 Iowa, 368.

"A patent for land to a fictitious person not in existence carries no title, vests no interest in any one." *Thomas* v. *Beeman*, 26 Missouri, 27; *Galt* v. *Galloway*, 4 Peters, 332; *Galloway* v. *Finley*, 12 Peters, 297.

The case of *Sampeyreac et al.* v. *The United States*, 7 Peters, was a bill for review to set aside a former decree in favor of Sampeyreac, vesting title in him under an alleged grant from the Governor of Louisiana, while it was a province of France, and which inured to the benefit of the claimant by virtue of the treaty of 1803. The grant and the decree founded thereon were attacked by the United States on the ground that Sampeyreac was a fictitious person. The Court, per Thompson, Justice, said: "The original party to the decree being a fictitious person, no title could pass under the patent, if issued. It would remain to the United States." (p. 241).

I must hold, therefore, that the patentees in this case being fictitious persons, no title passed from the United States by virtue of the patent in question.

There could be no conveyance of the title where there was no grantee to take the title. The patents were and are absolutely null and void.

The respondents claim protection as *bona fide* purchasers for value without notice of the fraud; but this defense can only be maintained by showing that the legal title has passed to them. The original patents being void for the want of the necessary grantees, as we have already seen, the title never passed from the United States, and the doctrine in question cannot be invoked. "The purchaser in all cases must hold the legal title, or be entitled to call for it, in order to give him a full protection of the defense; for if this title is merely equitable, then he must yield to a legal and equitable title in the adverse party." (Story Eq. Jur., Sec. 64, *c.*) In the case of *Sampeyreac* v. *United States, supra*, this defense was interposed by the respondent, Joseph Stewart, who was allowed to intervene and plead that he was a *bona fide* purchaser for value

and without notice.  The Court, however, upon hearing, over-ruled the defense, upon the ground, among others, as stated in the opinion, that "on general principles it is incontestable that a grantor can convey no more than he possesses.  Hence, those who come in under the holder of a void grant can acquire nothing."  In that case Stewart purchased upon the faith of a grant which had been confirmed by a decree of a Court of equity in Arkansas Territory.   He was not protected, because both grant and decree were afterwards held fraudulent and void, on the ground that the supposed grantor in the one, com-plainant in the other, was a fictitious person.  The case is cer-tainly as strong as the one before us.   And see *Gray* v. *Jones*, 14 Fed. Rep., 83, S. C., 3 McCrary.

In the light of these principles and authorities, it is impos-sible to hold that the respondents, or any of them, ever ac-quired a right to the land in controversy by reason of their standing in the character of *bona fide* purchasers.   The title has never passed from the United States.   A person who has acquired title by fraud may make a valid conveyance to a *bona fide* purchaser; but one who has never acquired the title can-not convey it, and much less can the title be transferred by fraudulently obtaining from the owner a deed purporting to convey it to a fictitious person, and then forging a conveyance from such fictitious person to another, however innocent the latter may be.

The counsel for respondents have argued very earnestly that, as this is a suit to rescind and set aside a deed for fraud, the rule which requires the injured party upon discovering the fraud, to give notice of his intention to rescind without delay, applies and bars relief.   The bill was filed in January, 1880. It is insisted that complainant had notice of the fraud as early as November, 1873, through a letter received at the General Land Office at Washington, from one E. J. Hubbard.  The let-ter is in evidence, and is as follows:

"LAW OFFICE OF GRAHAM,
"TRINIDAD, COLORADO, November 28, 1873.
*"Honorable Commissioner of United States Land Office:*
"SIR:—The most gigantic frauds upon the Department you control are being perpetrated in this portion of Colorado. Coal lands are being entered as agricultural lands by *straw men*,

and conveyances made to the procurers of these perjuries (who pretend to be innocent in the matter).    This portion of Colorado is all coal land.    Townships 33, 32 and 30, in range 64, are coal lands (every section), except a little on the river bottom.    There are over thirty townships north of range 33 and west of 63 that have coal on every section, and the agricultural land does not exceed three sections.    These parties even sell out and then apply to the General Land Office to change the location of the lands patented.  Of this latter I am advised by common rumor.

"The people rely on the laws to protect, and ask the Department to assist them in their rights.    There is something out of proportion in our Land Office.

"The Register and Receiver are charged with complicity in these things.

"If the United States Attorney will take the matter in hand the matter can be fastened on the proper parties, but in the meantime, unless your Department is vigilant, and dishonest men thwarted, the Government is defrauded of thousands of acres of its most valuable coal lands.    I am, very respectfully,

"E. J. HUBBARD."

[Endorsed]:

"Letter K, No. 78,067, to E. J. Hubbard, Trinidad, Colorado Territory, November 23, 1873.    Alleges fraud on the Government, etc.    Answered December 11, 1873.   Referred to Dir. N. Received (G. L. O.,) December 3, 1873."

It will be observed that this letter designates no particular entries as fraudulent, and describes no particular lands that were being fraudulently entered.    The writer's purpose, which was most laudable, seems to have been to induce the Land Department to institute an investigation.    It is more than doubtful whether this letter can be regarded as a sufficient notice to the United States of the existence of particular frauds now in question, even assuming that a volunteered communication from a private citizen to a bureau office in the Interior Department could in any case be held to charge the Government with notice of its contents.    Waiving, however, the consideration of this question, I am constrained to hold that laches cannot be imputed to the Government.    It is true, as a general proposition, that when the Government becomes a party to a suit in its own Courts, it stands upon the same footing with individuals, and must submit to the law as it is administered between man and man.    But this general rule has its limitations,

and one of them is, that neither the defense of the statute of limitations nor that of laches can be pleaded against the United States. "The general principle is, that laches is not imputable to the Government; and the maxim is founded, not in the notion of extraordinary prerogation, but upon a great public policy. The Government can transact its business only through its agents; and its fiscal operations are so various and its agencies so numerous and scattered that the utmost vigilance would not have saved the public from the most serious losses, if the doctrine of laches can be applied to its transactions." *U. S.* v. *Kirkpatrick*, 9 Wheat., 736; *U. S.* v. *Hoar*, 2 Mason, 311; *U. S.* v. *Williams*, 5 McLean, 133; *Gibson* v. *Chouteau*, 13 Wallace, 92; *U. S.* v. *Thompson*, 98 U. S., 486; *Gorsson* v. *U. S.*, 97 U. S., 584.

If, indeed, the lapse of time since the cause of action accrued has been so great as to afford the reasonable presumption that the witnesses who could testify concerning it are all dead, and the proofs lost or destroyed, a Court of equity may, no doubt, on that ground refuse to entertain the controversy. (*U. S.* v. *Beebee*, 4 McCrary, 12.) But this cannot be claimed upon the facts of the present case. At most the lapse of time here was only six or seven years, and it is not claimed that the witnesses who could testify from personal knowledge of the facts are all dead, nor that the proofs have been lost or destroyed. Independently of these considerations, it is difficult to see upon what principle this doctrine concerning the duty promptly to rescind can be applied to a case of this kind, where there never was a contract in the sense of an agreement between contracting parties. The rule requires the defrauded party to give notice to the party guilty of the fraud, of his purpose to rescind and demand a return of the property conveyed. But where the other party has no existence, where the conveyance has been made to a myth, how can this rule be applied? To whom shall notice be given? Upon whom shall demand for a return or recoverance of the property be made? It is also insisted that the United States has not returned the money received for those fraudulent conveyances, and that therefore this suit cannot be maintained without considering whether the Government is bound, as a condition

precedent to its right to file a bill to set aside a fraudulent patent, to pay or tender to the patentee the consideration received, it is sufficient to say in the present case that there are no patentees, and therefore no one in existence to whom such payment could properly be made.

The counsel for the respondents insist that the complainant ought to be bound by the patents issued, even though the patentees were myths, because the respondents have acted in good faith, upon the assumption that they were valid, relying upon the record.   It is insisted that the facts present a case of equitable estoppel, upon the theory that "when one of two innocent persons must suffer a loss, it should be borne by that one of them who, by his conduct, acts or omissions, has rendered the injury possible."   It is a conclusive answer to this contention to say that the respondents are not innocent purchasers within the meaning of the rule, as we have already seen.   But I think it proper to add that so far as I know it has never been held that the United States can be estopped by the frauds, not to say crimes, of the public officials; and it is apparent that the consequences of such a doctrine would be ruinous.  In my opinion the doctrine of estoppel does not apply.

Upon the whole case my conclusion is, that there must be a decree for complainant in accordance with the prayer of the bill, and it is accordingly so ordered.

*Decker & Yonley*, for complainant.

*Lyman K. Bass, Wolcott & Milburn*, for respondents.