PEOPLE ex rel. CONNECTING TERMINAL R. CO. v. MILLER,
State Comptroller.

(Supreme Court, Appellate Division, Third Department. May 12, 1903.)

1. TAXATION—CORPORATE FRANCHISE—ELEVATOR WAREHOUSE COMPANY—INTERSTATE COMMERCE.

A domestic railroad corporation owning land within the state, upon which it has a grain elevator and freight warehouse, and several lines of railroad tracks to afford access to the buildings, but which owns no rolling stock, its entire business consisting in loading, unloading, and storing grain and other freight in process of interstate transportation, which it receives from other companies, is liable to a gross earnings tax

on its franchise under Laws 1896, p. 857, c. 908, § 184, and Laws 1881, p. 484, c. 361, § 6, taxing railroad companies, it not being engaged in interstate commerce within the provision of the federal Constitution vesting the regulation of interstate commerce in Congress.

Smith and Chase, JJ., dissenting.

Certiorari by the people, on the relation of the Connecting Terminal Railroad Company, against Nathan L. Miller, as comptroller of the state of New York, to review defendant's refusal to readjust a tax assessment. On writ and return. Defendant's determination affirmed.

Argued before PARKER, P. J., and SMITH, KELLOGG, CHASE, and CHESTER, JJ.

Henry Galbraith Ward and Sidney Ward, for relator.

John Cunneen, Atty. Gen., and W. H. Wood, Dep. Atty. Gen., for defendant.

CHESTER, J.    This is a proceeding to review the determination of the comptroller in declining to make a revision and readjustment of an assessment made by him upon the franchise or business of the relator, based on its gross earnings for 17 years ending June 30, 1899. The validity of the taxes based upon such assessment is challenged only on the ground that the law authorizing them is in violation of the provision of the United States Constitution which gives to Congress the power to regulate commerce among the several states, the claim being that all the earnings upon which the taxes were based were derived by the relator from interstate commerce.

The assessment was made under Laws 1880, p. 763, c. 542, and the several acts amending the same, and under section 184 of the tax law (Laws 1896, p. 857, c. 908). The tax law (Laws 1896, p. 795, c. 908) provides, in section 184, that every transportation and other corporation there defined "shall pay for the privilege of exercising its corporate franchises or carrying on its business in such corporate or organized capacity in this state, an annual excise tax or license fee which shall be equal to five-tenths of one per centum upon its gross earnings from its transportation or transmission business originating and terminating within this state, but shall not include earnings derived from business of an interstate character." As the taxes imposed cover 17 years, reference must be made to the law in force prior to the enactment of the tax law. That is found in section 6, Laws 1881, p. 484, c. 361, and provided that every corporation formed for transportation purposes "shall pay to the State Treasurer for the use of the state, as a tax upon its corporate franchise or business in this state, a tax at the rate of five-tenths of one per centum upon the gross earnings in this state of said corporation * * * for * * * transportation * * * business transacted in this state." There was no exclusion in the terms of the old law, as in the new, of earnings derived from interstate commerce. Nevertheless, if the relator is correct in its contention that the taxes as against it are an unlawful interference by the state with such commerce, these taxes could not be exacted under the old law any more than under the new, because of the constitutional prohibition, which was superior to both

statutes. If, on the other hand, the earnings of the relator were not derived from commerce between the states, then it is liable for the tax under both laws.

The important question to be determined, therefore, is whether the earnings which formed the basis for these taxes were derived from business of an interstate character. The relator is a domestic corporation, organized in 1881 under the act to authorize the formation of railroad companies. It owns a piece of land fronting about 1,650 feet on the Niagara river, in the city of Buffalo, upon which it has a grain elevator and freight warehouse and several lines of railroad tracks. These tracks are used to afford facilities for access to its elevator and warehouse by cars owned by other companies, and for loading and unloading such cars. It owns no engines, cars, or boats. Its entire business is transacted in Buffalo, and consists in loading, unloading, and storing grain and other freights which, on the one hand, come from places outside the state and are destined to points in the state or elsewhere, and, on the other, which come from points in the state and are destined to places in other states. It handles no local freight. All its receipts are from such business, and come from the payment to it by the several companies who employ it of fixed charges per bushel on the grain handled, and a fixed rate per ton upon the package freight, which charges include the elevator service and the use of the yards for car storage and car service over its tracks. These charges also cover a 10-day storage privilege, and for freights remaining longer than that an additional storage charge is made. The shortest storage period is about 10 days, and the longest about 3 months. This work is done by the relator for various railroad and other transportation companies having terminals on Buffalo Harbor.

The character of elevator warehouses, as related to interstate commerce, was a subject of comment in the well-known case of Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77. There the Legislature of Illinois passed a law fixing the maximum charge for the storage and handling of grain in elevator warehouses in certain cities, and one of the questions presented was whether the law was repugnant to the constitutional power of Congress to regulate commerce between the states. The Supreme Court of Illinois held that it was not, and the judgment was affirmed by the United States Supreme Court. Mr. Chief Justice Waite, who wrote the prevailing opinion in the latter court, said:

"It was very properly said in the case of the State Tax on Railway Gross Receipts, 15 Wall. 232 [21 L. Ed. 146], that 'it is not everything that affects commerce that amounts to a regulation of it, within the meaning of the Constitution.' The warehouses of these plaintiffs in error are situated and their business carried on exclusively within the limits of the state of Illinois. They are used as instruments by those engaged in state as well as those engaged in interstate commerce, but they are no more necessarily a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another. Incidentally they may become connected with interstate commerce, but not necessarily so. Their regulation is a thing of domestic concern, and certainly, until Congress acts in reference to their interstate relations, the state may exercise all the powers of government over them, even though in so doing it may indirectly operate upon commerce outside its immediate jurisdiction."

The Munn Case above referred to has been the subject of much discussion and some criticism in the courts, but in the later case of Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247, the cases where the Munn Case had been commented upon were reviewed, and the doctrine of that case was adhered to. It is true that in the Budd Case the right to fix maximum charges by public elevator warehouses was put upon the ground that legislation fixing such charges was a valid exercise of the police power of the state, and no such question is involved in the case at bar, yet the other question involved in the Munn Case, i. e., as to the character of such warehouses as related to interstate commerce, was referred to, and no dissent from the doctrine of that case in that respect is to be found in the prevailing opinion.

Taking the Munn Case as an authority, it would appear reasonable to say that, while the business of the relator was incidentally connected with interstate commerce, yet its business is not of itself such commerce. It simply performs services all within this state, with the facilities which it has, upon the employment of companies engaged in commerce between the states. Suppose it owned the docks where the boats from the Lakes tied up and discharged their freights before being transferred to other carriers, would the charges for wharfage be earnings from interstate commerce? Or, if it owned trucks which were employed in carting interstate freights from one dock to another while in transit, or from the terminal of one transportation company to the terminal of another, both in the state, would its charges for such services be such earnings? It seems not, if the Munn Case is to be regarded as an authority. Yet the services which it renders are of a kindred character to those mentioned. I have grave doubts as to the correctness of this conclusion, yet, as the United States Supreme Court is the final arbiter upon a question such as is presented here, until that court departs from the doctrine laid down in the Munn Case I think it should be followed by us. It may be said that the conclusion reached finds some support in People v. Knight, 171 N. Y. 354, 64 N. E. 152.

The determination of the comptroller should be confirmed, with $50 costs and disbursements. All concur, except SMITH and CHASE, JJ., who dissent.